**VERIZON MARYLAND INC., f/k/a BELL ATLANTIC–MARYLAND, INC. Plaintiff,**

v.

**RCN TELECOM SERVICES, INC., f/k/a RCN TELECOM SERVICES OF MARYLAND INC., et al., Defendants.**

No. CIV.S–99–2061.

United States District Court, D. Maryland, Northern Division.

Nov. 19, 2002.

James P. Garland, Miles and Stockbridge PC, Baltimore, MD, Mark L. Evans, Sean A. Lev, Aaron M. Panner, Kellogg Huber Hansen Todd and Evans LLC, Washington, DC, for Plaintiff.

John R. Harrington, Darryl M. Bradford, Jenner and Block, Chicago, IL, Jodie L. Kelley, Elena Nicole Broder–Feldman, Jenner and Block, Washington, DC, Glen Keith Allen, Piper Rudnick LLP, Baltimore, MD, Michael L. Shor, Robin L. Redfield, Richard M. Rindler, Swidler Berlin Shereff Friedman LLP, Washington, DC, Matthew W. Nayden, Kelly Culp Hoelzer, Ober Kaler Grimes and Shriver, Baltimore, MD, Michael Albert McRae, Oakton, VA, Susan Stevens Miller, Maryland Public Service Commission, Baltimore, MD, Kaye A. Allison, Office of the United States Attorney, Baltimore, MD, Theodore C. Hirt, David T. Zaring, U.S. Department of Justice Civil Division Federal Programs Branch, Washington, DC, Rachel J. Hines, United States Department of Justice, Washington, DC, Michael J. Travieso, Theresa V. Czarski, Maryland Peoples Counsel, Baltimore, MD, David A. Konuch, Kelley Drye and Warren LLP, Washington, DC, Ira T. Kasdan, Kelley Drye and Warren LLP, Vienna, VA, James R. J. Scheltema, Glbal NAPs Inc., Columbia, MD, for Defendants.

## MEMORANDUM OPINION

SMALKIN, Chief Judge.

The plaintiff, Verizon Maryland Inc. ("Verizon"), formerly known as Bell Atlantic–Maryland, Inc., filed an amended complaint against the defendants alleging that the Public Service Commission of Maryland ("PSC") issued certain orders that

violate the Telecommunications Act of 1996 ("the 1996 Act"), Pub.L. 104–104, 110 Stat. 56 (codified as amended in scattered sections of 47 U.S.C.). Now before the Court are the motions to dismiss of: (1) Catherine I. Riley, Claude M. Ligon, J. Joseph Curran III, Gail C. McDonald, and Ronald Guns, all in their official capacities as members of the PSC (collectively, "the commissioners"); (2) Global NAPS, Inc. ("Global"); and (3) Core Communications, Inc. ("Core"). Also before the Court is the alternative motion of Core to be dropped as a defendant under Federal Rule of Procedure 21. MCI WorldCom Communications, Inc. ("WorldCom"), has intervened to defend the actions of the PSC. The United States of America has also intervened, filing an opposition to the commissioners' motion to dismiss, and asking the Court to reject the commissioners' assertion of sovereign immunity and to defend the constitutionality of the 1996 Act. The issues have been fully briefed by the parties, and no oral hearing is necessary. Local Rule 105.6 (D.Md.).

## BACKGROUND

Congress enacted the 1996 Act to promote competition in local telecommunications markets. *See AT & T Corp. v. Iowa Utils. Bd.*, 525 U.S. 366, 371, 119 S.Ct. 721, 142 L.Ed.2d 835 (1999). Toward that end, the 1996 Act imposes various obligations on incumbent local-exchange carriers ("ILECs"), including a duty to share their networks with competing local-exchange carriers ("CLECs"). *See* 47 U.S.C. § 251(c). When a CLEC seeks access to the market, the ILEC must "provide ... interconnection with" its network. *Id.* § 251(c)(2). The carriers must then "establish reciprocal compensation arrangements for the transport and termination of telecommunications." *Id.* § 251(b)(5).

An ILEC "may negotiate and enter into a binding agreement" with a CLEC to fulfill the duties imposed by § 251(b) and (c), but "without regard to the standards set forth in" those provisions. *Id.* § 252(a)(1). The parties must negotiate in good faith. *Id.* § 251(c)(1). If private negotiations fail, either party may petition the relevant state commission to arbitrate open issues. *Id.* § 252(b). The state commission, if it wishes, may opt out, leaving the Federal Communications Commission ("FCC") to arbitrate in its stead. *Id.* § 252(e)(5).

Once an interconnection agreement is in place, whether negotiated, mediated, or arbitrated, the parties must submit it to the state commission for approval or rejection. *Id.* § 252(e)(1). The state commission must ensure that each agreement is consistent with certain requirements of the 1996 Act, but may also enforce requirements of state law, such as intrastate quality service standards. *Id.* § 252(e)(2), (3). A state commission may reject a voluntarily negotiated agreement only if it discriminates against a carrier not a party, or if its implementation "is not consistent with the public interest, convenience, and necessity." *Id.* § 252(e)(2)(A). A party aggrieved by a "determination" of a state commission under § 252 may bring an action in federal district court "to determine whether the agreement ... meets the requirements" of §§ 251 and 252. *Id.* § 252(e)(6).

In this case, Verizon, the ILEC in Maryland, negotiated an interconnection agreement (the "WorldCom agreement") with MFS Intelenet of Maryland, Inc., later acquired by intervenor WorldCom. The PSC approved the agreement on October 9, 1996. Neither party sought review in federal district court (or elsewhere). The five defendant CLECs—RCN Telecom Services, Inc., Starpower Communications, LLC, TCG–Maryland, Global, and Core— all subsequently entered into voluntary agreements with Verizon in relevant part substantively identical to the WorldCom

agreement.[1] The PSC approved them all; no one sought review.

Sometime after the PSC approved the WorldCom agreement, a dispute arose between Verizon and WorldCom over the terms of the reciprocal compensation arrangement. The agreement required reciprocal compensation for "local traffic." Am. Compl., Ex. C, ¶¶ 1.44, 1.61, 5.7. When a Verizon customer would place a local call to a WorldCom customer, the caller would be using part of WorldCom's network, and Verizon would have to compensate WorldCom for such usage. The agreement set the rates of compensation. As it happened, several customers of WorldCom were internet service providers ("ISPs"), offering modem-based internet access to their own customers. The customers of the ISPs, through their computers, placed telephone calls to their ISPs, which then connected them to the internet. Needless to say, these internet-bound calls tended to be longer than average local calls, and many of the ISPs' customers used Verizon as their local telephone service provider. Thus, if this internet-bound traffic were "local," Verizon would have to pay reciprocal compensation to WorldCom; if nonlocal, no reciprocal compensation would be due.

Around April 1997, Verizon informed WorldCom that it would no longer pay reciprocal compensation for telephone calls made by Verizon's customers to ISPs serviced by WorldCom. Verizon claimed that such calls were not "local traffic" because the ISPs were connecting customers to distant websites. WorldCom disputed Verizon's claim and filed a complaint with the PSC. On September 11, 1997, the PSC found in favor of WorldCom, ordering Verizon "to timely forward all future interconnection payments owed [WorldCom] for telephone calls placed to an ISP" and to pay WorldCom any reciprocal compensation that it had withheld pending resolution of the dispute. Am. Compl., Ex. D (the *"First WorldCom Order"*). Verizon appealed to a Maryland state court, which affirmed the PSC's order.

Subsequently, the FCC issued a ruling that categorized internet-bound calls as nonlocal, but concluded that, absent a federal compensation mechanism, state commissions could construe interconnection agreements as requiring reciprocal compensation. *See IN RE IMPLEMENTATION OF THE LOCAL COMPETITION PROVISIONS OF THE TELECOMMUNICATIONS ACT OF 1996*, 1999 WL 98037, 14 F.C.C.R. 3689 (1999)(the *"ISP Order"*), vacated and remanded, *Bell Atl. Tel. Cos. v. FCC*, 206 F.3d 1 (D.C.Cir. 2000).[2] Verizon filed a new complaint with

---

**1.** Core and Global both entered into these agreements after Verizon had filed its original complaint. Core requested that Verizon negotiate the terms of an interconnection agreement in August 2000. Sometime thereafter, pursuant to § 252(i), it elected to "opt in" to an agreement between Verizon and MCImetro Access Transmission Services, LLC, also later acquired by WorldCom. The PSC approved the Core–Verizon agreement on March 19, 2001. Adopting Verizon's PSC-approved "statement of generally available terms," *see* 47 U.S.C. § 252(f), Global entered into an agreement with Verizon in August 2000. The PSC approved the Global–Verizon agreement on May 9, 2001.

**2.** On remand, the FCC issued another ruling. *See In re Implementation of the Local Competition Provisions in the Telecommunications Act of 1996*, 16 F.C.C.R. 9151 (2001)(the *"ISP Remand Order"*). The *ISP Remand Order* again determined that internet-bound calls are nonlocal. It also established a transitional, prospective regime for intercarrier compensation for such calls, to take effect as pre-existing contracts expire. *See ISP Remand Order*, 16 F.C.C.R. at 9186–97. Without vacating this ruling, the D.C. Circuit has remanded it to the FCC for reconsideration. *See WorldCom, Inc. v. FCC*, 288 F.3d 429 (D.C.Cir.2002).

the PSC, arguing that the *ISP Order* dictated that Verizon no longer had to provide reciprocal compensation for internet-bound traffic. In a 3–to–2 decision, the PSC rejected Verizon's argument, concluding as a matter of state contract law that Verizon and WorldCom had agreed to treat internet-bound calls as local traffic, subject to reciprocal compensation. *See* Am. Compl., Ex. A (the *"Second World-Com Order"*).

Verizon filed an action in this Court to review the *Second WorldCom Order,* citing 47 U.S.C. § 252(e)(6) and 28 U.S.C. § 1331 as bases for jurisdiction. The original complaint named as defendants the PSC, its individual members in their official capacities, WorldCom, and five other CLECs. On motion of the PSC, this Court dismissed the complaint, holding that the doctrine of sovereign immunity precluded its exercise of subject-matter jurisdiction under either § 252(e)(6) or § 1331. A divided panel of the Fourth Circuit affirmed. *See Bell Atlantic Maryland, Inc. v. MCI Worldcom, Inc.,* 240 F.3d 279 (4th Cir.2001). Verizon petitioned the Supreme Court for a writ of certiorari.

Soon thereafter, Verizon informed Core that it would no longer pay reciprocal compensation for telephone calls made by Verizon's customers to ISPs serviced by Core. Core, just as WorldCom had before it, filed a complaint with the PSC. On June 13, 2001, the PSC ruled that Verizon must continue to reciprocally compensate Core for internet-bound calls until the PSC approved an amendment to their existing interconnection agreement. *See* Am. Compl., Ex. J (the *"Core Letter Order"*). The PSC, therefore, enjoined Verizon "from withholding reciprocal compensation payments" due Core. *Id.* At the time, Verizon sought no review of the PSC's decision.

On December 12, 2001, the Supreme Court granted certiorari in the matter of the *Second WorldCom Order.* 534 U.S. 1072 (2001). Then, without dissent, it vacated the judgment of the Fourth Circuit. *See Verizon Md., Inc. v. Pub. Serv. Comm'n,* 535 U.S. 635, 122 S.Ct. 1753, 152 L.Ed.2d 871 (2002). The Court ruled, first, that a federal district court has subject-matter jurisdiction to entertain a claim that a state commission order interpreting and enforcing an interconnection agreement violates federal law. *Id.* at 1758. Although the Court declined to resolve the question whether § 252(e)(6) authorizes such review, it "agree[d] ... that even if § 252(e)(6) does not *confer* jurisdiction, it at least does not *divest* the district courts of their authority under 28 U.S.C. § 1331 to review the [PSC]'s order for compliance with federal law." *Id.*

Next, the Court held that the doctrine of sovereign immunity does not bar Verizon's claim because the (countervailing) doctrine of *Ex Parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), permits Verizon to proceed against the commissioners of the PSC in their official capacities. *Id.* at 1760. The Court asserted that Verizon's "prayer for injunctive relief—that state officials be restrained from enforcing an order in contravention of controlling federal law—clearly satisfies" the requirements of an *Ex Parte Young* suit. *Id.* It noted that Verizon's prayer for declaratory relief "seeks a declaration of the *past,* as well as the *future,* ineffectiveness of the [PSC]'s action, so that the past financial liability of private parties may be affected." *Id.* Nevertheless, because "no past liability of the State, or any of its commissioners, is at issue," the Court concluded that the prayer for declaratory relief likewise satisfies the strictures of *Ex Parte Young. Id.*

The Supreme Court remanded the case to the Fourth Circuit, which in turn re-

manded it to this Court for further proceedings. As soon as this Court assumed jurisdiction, Verizon filed the instant amended complaint. The amended complaint drops the PSC and WorldCom as defendants—the latter because it has filed for reorganization under Chapter 11 of the Bankruptcy Code. It substitutes the new PSC commissioners for their predecessors. It also adds two other CLECs as defendants, Global and Core, which have subsequently entered into an interconnection agreement with Verizon. *See supra* note 1. Finally, the amended complaint adds a count asserting another cause of action as a remedy for the statutory violation Verizon alleges.

Count I of the amended complaint alleges that the PSC's decisions in the *Second WorldCom* and *Core Letter Orders* that internet-bound calls constitute "local traffic" within the meaning of the relevant agreements are inconsistent with federal law and the parties' intent. Count II alleges that the PSC's concomitant decision to require reciprocal compensation for internet-bound calls in instances where the parties could not agree on rules governing compensation for such traffic likewise violates federal law. Finally, Count III alleges that the *Second WorldCom* and *Core Letter Orders,* issued by the commissioners acting in their official capacities under color of state law, deprive Verizon of its federal statutory rights in violation of § 1983 of the Civil Rights Act of 1871 (" § 1983").

As remedy, Verizon requests that this Court issue an order: (1) declaring the PSC's decisions unlawful; (2) enjoining all defendants, and all parties acting in concert therewith, from seeking to enforce the decisions against Verizon; and (3) requiring the commissioners of the PSC to order the defendant carriers to refund all monies obtained from Verizon in reciprocal compensation fees for internet-bound traffic. Am. Compl. at 19.

## STANDARD OF REVIEW

■ The defendants ground their motions to dismiss both upon Federal Rule of Civil Procedure 12(b)(1), for lack of subject-matter jurisdiction, and upon Federal Rule of Civil Procedure 12(b)(6), for failure to state a claim upon which relief can be granted. Necessarily, resolution of a question of subject-matter jurisdiction takes precedence over resolution of a question whether a plaintiff has stated a cause of action: without jurisdiction, the court has no power to rule on the validity of a claim. *Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83, 94–95, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998); *see also Bell v. Hood,* 327 U.S. 678, 682, 66 S.Ct. 773, 90 L.Ed. 939 (1946) ("For it is well settled that the failure to state a proper cause of action calls for a judgment on the merits and not for a dismissal for want of jurisdiction. Whether the complaint states a cause of action on which relief can be granted is a question of law and just as issues of fact it must be decided after and not before the court has assumed jurisdiction ...."); *Ex parte McCardle,* 74 U.S. (7 Wall.) 506, 514, 19 L.Ed. 264 (1868)("Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause.").

Most of the pending motions to dismiss obviously challenge either the subject-matter jurisdiction of this Court under Rule 12(b)(1), or the validity of Verizon's claim under Rule 12(b)(6). The commissioners of the PSC, however, assert two constitutional bars to Verizon's suit whose nature is less obvious: sovereign immunity ("exemplified," if not "established," by the Eleventh Amendment, *see Alden v. Maine,* 527 U.S. 706, 728–29, 119 S.Ct. 2240, 144

L.Ed.2d 636 (1999))and the Tenth Amendment.

■ Because "the principle of sovereign immunity is a constitutional limitation on the federal judicial power established in Art[icle] III," it would seem to limit the extent of a federal court's subject-matter jurisdiction. *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 98, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984); *see also Ex parte New York,* 256 U.S. 490, 497, 41 S.Ct. 588, 65 L.Ed. 1057 (1921)("[T]he entire judicial power granted by the Constitution does not embrace authority to entertain a suit brought by private parties against a State without consent given . . . ."). As against a sovereign state, a court has no power to declare the law on behalf of private litigants, absent the state's consent. The commissioners' assertion of sovereign immunity, therefore, raises an objection analyzable under the rubric of Rule 12(b)(1). *But see Andrews v. Daw,* 201 F.3d 521, 524 n. 2 (4th Cir.2000)(noting that the Fourth Circuit has not clearly determined whether a dismissal grounded in sovereign immunity operates as a dismissal for lack of subject-matter jurisdiction or for failure to state a claim).

■ Unlike the principle of sovereign immunity, however, the Tenth Amendment limits not so much judicial, as *legislative* authority. It protects the states from action by Congress that exceeds the scope of Congress's specifically enumerated powers under Article I. *See, e.g., New York v. United States,* 505 U.S. 144, 156, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992)("If a power is delegated to Congress in the Constitution, the Tenth Amendment expressly disclaims any reservation of that power to the States; if a power is an attribute of state sovereignty reserved by the Tenth Amendment, it is necessarily a power the Constitution has not conferred on Congress."). If, as the commissioners contend, some portion of the 1996 Act offends the Tenth Amendment as to bar Verizon's suit, this Court has the power to say so. The Tenth Amendment may doom the legal premises of the plaintiff's complaint; it does not strip the court of its jurisdiction. The commissioners' assertion of the constraint of the Tenth Amendment, therefore, raises an objection properly analyzable under the rubric of Rule 12(b)(6). *See Dist. 28, United Mine Workers of Am., Inc. v. Wellmore Coal Corp.,* 609 F.2d 1083, 1086 (4th Cir.1979)(observing that the purpose of a motion under Rule 12(b)(6) "is to provide a defendant with a mechanism for testing the legal sufficiency of the complaint").

Classification of the defendants' motions only dictates the order in which the court ought address them. It does not substantially affect how the court assesses them. Because the defendants do not contest the truth of the jurisdictional facts alleged in the complaint, Verizon enjoys the same procedural safeguards in its opposition to any Rule 12(b)(1) motion as it enjoys in its opposition to any Rule 12(b)(6) motion. *See Adams v. Bain,* 697 F.2d 1213, 1219 (4th Cir.1982)(setting forth the standard for evaluating motions to dismiss for lack of subject-matter jurisdiction under Rule 12(b)(1)). The court accepts the plaintiff's allegations as true, construing them most favorably to the plaintiff, and relies solely on the pleadings, disregarding any affidavits or other materials. *Id.; Star Scientific Inc. v. R.J. Reynolds Tobacco Co.,* 174 F.Supp.2d 388, 391 (D.Md.2001). The defendants should prevail only if entitled to do so as a matter of law. *Richmond, Fredericksburg & Potomac R.R. Co. v. United States,* 945 F.2d 765, 768 (4th Cir. 1991). Thus, dismissal is inappropriate "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of [its] claim which would entitle [it] to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)(ar-

ticulating the standard for evaluating a motion to dismiss for failure to state a claim under Rule 12(b)(6)).

■ With regard to Core's alternative motion under Rule 21, a court possesses broad discretion in determining whether to drop a party from an action. *See CVI/ Beta Ventures, Inc. v. Custom Optical Frames, Inc.,* 896 F.Supp. 505, 506 (D.Md. 1995); 4 James Wm. Moore et al., Moore's Federal Practice § 21.02[4], at 21–10 (3d ed.1997). Principles of fundamental fairness and judicial efficiency are the twin lodestars. *See CVI/Beta Ventures, Inc.,* 896 F.Supp. at 506 ("A claim may be severed if it will serve the ends of justice and further the prompt and efficient disposition of litigation.").

## *ANALYSIS*

### A. *Subject–Matter Jurisdiction*

#### 1. *Sovereign Immunity and the Law of the Case*

■ The Supreme Court has held expressly and unequivocally that Verizon may proceed *in this case* against the individual commissioners of the PSC in their official capacities, pursuant to the doctrine of *Ex Parte Young. Verizon Md. Inc.,* 122 S.Ct. at 1760–61. The commissioners nevertheless invite this Court to decide otherwise. The Court declines the invitation, which defies both law and logic. Legally, this Court cannot but obey the mandate of the Supreme Court. *Sibbald v. United States,* 37 U.S. (12 Pet.) 488, 492, 9 L.Ed. 1167 (1838)("Whatever was before the [Supreme] Court, and is disposed of, is considered as finally settled. The inferior court is bound by the decree as the law of the case; and must carry it into execution, according to the mandate. They cannot vary it, or examine it for any other purpose than execution; or give any other or further relief; or review it upon any matter decided on appeal for error apparent; or intermeddle with it, further than to

settle so much as has been remanded."). Logically, Verizon's complaint against the commissioners "alleges an ongoing violation of federal law and seeks relief properly characterized as prospective"—the essential elements of an *Ex Parte Young* action. *Idaho v. Coeur d'Alene Tribe of Idaho,* 521 U.S. 261, 296, 117 S.Ct. 2028, 138 L.Ed.2d 438 (1997); *see also Verizon Md. Inc.,* 122 S.Ct. at 1760.

If, as Verizon alleges, the *Second World-Com Order* violates the 1996 Act, its enforcement constitutes an ongoing violation of federal law. The alleged violation is ongoing because enforcement affects the rights and obligations of Verizon (and the CLECs) both now and into the future. Of course, as the commissioners belabor the obvious, their alleged misinterpretation of the 1996 Act or the agreement at issue cannot itself have violated federal law. If federal law authorizes them to arbitrate and interpret interconnection agreements, this authority necessarily encompasses the power both to interpret *and to misinterpret* (at least in good faith) the 1996 Act and any agreement under it. *See Larson v. Domestic & Foreign Commerce Corp.,* 337 U.S. 682, 695, 69 S.Ct. 1457, 93 L.Ed. 1628 (1949)(rejecting the view "that an officer given the power to make decisions is only given the power to make correct decisions"); *see also Pennhurst State Sch. & Hosp.,* 465 U.S. at 112–13 n. 22, 104 S.Ct. 900. The commissioners exceed the scope of their authority, however, and so violate federal law, if they enforce their misinterpretation in derogation of a right that the 1996 Act secures.

Finally, any injunction this Court may issue would not compel the commissioners to perform some discretionary action. *See Ex Parte Young,* 209 U.S. at 158, 28 S.Ct. 441 ("There is no doubt that the court cannot control the exercise of the discretion of an officer. It can only direct affir-

mative action where the officer having some duty to perform not involving discretion, but merely ministerial in its nature, refuses or neglects to take such action."). The 1996 Act gives the commissioners broad, though not unfettered, discretion to arbitrate and interpret. *Compare, e.g.,* 47 U.S.C. § 252(c)(1)(obliging a state commission to ensure that an agreement adopted by arbitration complies with federally prescribed requirements) *with id.* § 252(e)(3)(preserving the authority of a state commission to enforce requirements of state law in its review of an agreement). It does not give them discretion to enforce an order that contravenes what the law commands. Thus an injunction restraining the commissioners from enforcing such an order "will not be bad ... and will be the proper form of remedy." *Prentis v. Atl. Coast Line Co.,* 211 U.S. 210, 230, 29 S.Ct. 67, 53 L.Ed. 150 (1908).

As the Supreme Court has held, Verizon's suit against the commissioners in their official capacities does not infringe the sovereign immunity of the state of Maryland. This Court, therefore, need not decide whether the PSC waived its immunity by participating in the regulatory scheme of the 1996 Act. *See Verizon Md. Inc.,* 122 S.Ct. at 1760.

### 2. *The Johnson Act*

■ The commissioners of the PSC also invoke the Johnson Act, 28 U.S.C. § 1342, as a jurisdictional bar to Count III of the amended complaint. The Johnson Act states in full:

> The district courts shall not enjoin, suspend or restrain the operation of, or compliance with, any order affecting rates chargeable by a public utility and made by a State administrative agency or a rate-making body of a State political subdivision, where:
>
> (1) Jurisdiction is based solely on diversity of citizenship or repugnance of

the order to the Federal Constitution; and,

> (2) The order does not interfere with interstate commerce; and,
>
> (3) The order has been made after reasonable notice and hearing; and,
>
> (4) A plain, speedy and efficient remedy may be had in the courts of such State.

28 U.S.C. § 1342. "The Johnson Act's limitation on federal jurisdiction applies only when all four of its conditions are met." *Williams v. Prof'l Transp., Inc.,* 294 F.3d 607, 612 (4th Cir.2002).

By its terms, the Johnson Act bars no part of Verizon's suit. Verizon bases none of its claims solely on diversity of citizenship or repugnance to the Constitution. On the contrary, jurisdiction in this case rests, at least in part, on the presence of a federal question, pursuant to 28 U.S.C. § 1331. *Verizon Md. Inc.,* 122 S.Ct. at 1758–59. Moreover, Verizon does not claim that the *Second WorldCom Order* violates the Constitution; it claims, instead, that the order violates a federal statute—the 1996 Act. Am. Compl. ¶ 1. The Johnson Act, therefore, does not apply. *See also Aluminum Co. of Am. v. Utils. Comm'n,* 713 F.2d 1024, 1028 (4th Cir.1983)(concluding likewise when jurisdiction over the plaintiff's claims was grounded in "federal questions, preemption and impermissible interference with interstate commerce").

### B. *Res Judicata*

■ The principle of res judicata encompasses two different doctrines concerning the preclusive effects of a prior adjudication: claim preclusion and issue preclusion. *New Hampshire v. Maine,* 532 U.S. 742, 748, 121 S.Ct. 1808, 149 L.Ed.2d 968 (2001). Claim preclusion "treats a judgment, once rendered, as the full measure of relief to be accorded be-

tween the same parties on the same 'claim' or 'cause of action.'" *Kaspar Wire Works, Inc. v. Leco Eng'g & Mach., Inc.,* 575 F.2d 530, 535 (5th Cir.1978). The judgment precludes litigation not only of every matter actually adjudicated in the prior proceeding, but also of every matter that the parties might have raised (but failed to do so). *First Union Commercial Corp. v. Nelson, Mullins, Riley & Scarborough (In re Varat Enters., Inc.),* 81 F.3d 1310, 1315 (4th Cir.1996). Issue preclusion focuses more tightly and applies when later litigation arises from a different cause of action. *Id.* It bars the relitigation of legal and factual issues actually litigated in the prior action and necessarily resolved by the judgment. *Id.*

■ Without articulating precisely the nature of the preclusion they seek to assert, the commissioners of the PSC, Global, and Core all invoke the principle of res judicata to bar Verizon's suit, either in whole or in part. Parties may raise the affirmative defense of res judicata in a Rule 12(b)(6) motion only when the facts supporting the defense clearly appear on the face of the complaint. *Andrews,* 201 F.3d at 524 n. 1. Here, the requisite facts so appear. The amended complaint includes both the *First* and *Second World-Com Order,* Am. Compl., Exs. D, A, and refers specifically to the judgment of the Maryland state court affirming the *First WorldCom Order,* Am. Compl. ¶ 28. In the *First WorldCom Order,* the PSC concluded, "based on the terms of the [World-Com agreement]," that WorldCom was entitled to compensation for the termination of internet-bound calls. Am. Compl., Ex. D. Thus, the defendants argue, insofar as resolution of the instant suit depends on determination of the parties' contractual intent, res judicata precludes it: a court has already necessarily determined their intent.

■ Of course, an administrative agency, just as any private party, can waive the defense of res judicata. *See* 18B Charles Alan Wright, Arthur R. Miller and Edward H. Cooper, Federal Practice and Procedure § 4475, at 470–74 (2d ed.2002). In its *Second WorldCom Order,* the PSC ignored whatever preclusive effect the judicial affirmance of its *First WorldCom Order* might have had. It reconsidered, *ab integro atque in plenum,* the intent of the parties. Without reference either to its earlier analysis or to the state court's judgment, the PSC began:

> We must determine whether the parties to the approved interconnection agreements intended, at the time those agreements were entered into, to treat ISP-bound telephone calls as local traffic subject to the payment of reciprocal compensation. First, we must focus on the actual language of the interconnection agreement under review.

Am. Compl., Ex. A at 11 (footnote omitted). In the end, it again determined: "Under all of the circumstances existing at the time the contract was entered into, we conclude that the parties contemplated reciprocal compensation payments for ISP traffic." *Id.* at 14.

While an "earlier administrative decision ... may be final and therefore properly treated as preclusive of a subsequent claim ... because the decision has been judicially affirmed," the principle of res judicata does not bar judicial review of the subsequent claim, "even though [it] be the same claim ..., if it has ... been reconsidered on the merits" by the agency. *McGowen v. Harris,* 666 F.2d 60, 65 (4th Cir.1981)(considering application of the principle of res judicata to decisions by the Social Security Administration on claims for disability benefits). By reconsidering what Verizon and WorldCom had intended when they entered the WorldCom agree-

ment, the PSC (and its *Ex parte Young* surrogates, the commissioners) cannot now preclude Verizon from challenging its re-decision in court. Nor can Global or Core preclude such a challenge.

### C. Causes of Action

#### 1. Cause of Action Under § 252(e)(6) of the 1996 Act

#### a. Against the PSC Commissioners and Global

■ The 1996 Act expressly confers on any "aggrieved" party a private right of action in federal district court to review a "determination" by a state agency under § 252 for compliance with the require-ments of §§ 251 and 252. 47 U.S.C. § 252(e)(6); *see also Verizon Md. Inc.*, 122 S.Ct. at 1759. Therefore, if the PSC's decision interpreting and enforcing Veri-zon's existing interconnection agreement constitutes a "determination" under § 252, Verizon may bring its claim before this Court.

Clearly, a state commission makes a de-termination pursuant to § 252 whenever it approves or rejects an interconnection agreement—whether negotiated, mediated, or arbitrated. 47 U.S.C. § 252(e)(1); *cf. id.* § 252(e)(4)(prohibiting state court re-view of "the action of a State commission in approving or rejecting an agreement"). As to whether Congress also intended to grant state commissions the power to in-terpret and enforce a previously approved agreement, the text speaks less clearly. The FCC, the federal agency authorized "to make rules governing matters to which the 1996 Act applies," *Iowa Utils. Bd.*, 525 U.S. at 380, 119 S.Ct. 721, has construed the statute to grant state commissions just such power. *See In re Starpower Commu-nications, LLC*, 2000 WL 767701, 15 F.C.C.R. 11,277, 11,279 (2000)(determining that "a dispute arising from interconnec-tion agreements and seeking interpreta-tion and enforcement of those agreements

is within the states' 'responsibility' under section 252"). So long as the FCC's con-struction of the 1996 Act is reasonable—not "arbitrary, capricious, or manifestly contrary to the statute"—the Court must defer to it. *Chevron U.S.A., Inc. v. Natu-ral Res. Def. Council, Inc.*, 467 U.S. 837, 842–44, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).

In *In re Starpower Communications, LLC*, the Virginia State Corporation Com-mission declined to take any action in a dispute between a CLEC and an ILEC over the interpretation and enforcement of an existing interconnection agreement. *See In re Starpower Communications, LLC*, 2000 WL 767701, 15 F.C.C.R. at 11,278. The dispute focused on the same substantive issue over which the parties here argue—reciprocal compensation for internet-bound traffic. *Id.* at 11,278 n. 7, 2000 WL 767701. After the Virginia com-mission had dismissed the CLEC's com-plaint, the CLEC filed a petition with the FCC in accordance with 47 U.S.C. § 252(e)(5), asking it to preempt the Virgi-nia commission's jurisdiction and resolve the dispute. *Id.* at 11,278, 2000 WL 767701.

In granting the petition, the FCC adopted the reasoning of the two federal courts of appeals (the Fifth and the Seventh Circuit) that had already con-fronted the issue. *Id.* at 11,279–80, 2000 WL 767701. The Fifth Circuit rea-soned: "[T]he Act's grant to the state commissions of plenary authority to ap-prove or disapprove these interconnec-tion agreements necessarily carries with it the authority to interpret and enforce the provisions of agreements that state commissions have approved." *South-western Bell Tel. Co. v. Pub. Util. Comm'n*, 208 F.3d 475, 479–80 (5th Cir. 2000); *cf. Ill. Bell Tel. Co. v. World-com Techs., Inc.*, 179 F.3d 566, 573 (7th Cir.1999)(stating more obliquely that a

state commission "was doing what it is charged with doing in the Act" when it determined contractual intent under existing interconnection agreements). The FCC observed that "[t]hese court opinions implicitly recognize that, due to its role in the approval process, a state commission is well-suited to address disputes arising from interconnection agreements." *In re Starpower Communications, LLC,* 15 F.C.C.R. at 11,279–80. The FCC's interpretation of the 1996 Act is no more arbitrary, and no less reasonable, simply because it relies on judicial opinion.

Subsequently, two other circuits (the Tenth and the Eighth) have endorsed this "necessary and proper" rationale. *See Southwestern Bell Tel. Co. v. Brooks Fiber Communications of Okla., Inc.,* 235 F.3d 493, 496–97 (10th Cir.2000); *Southwestern Bell Tel. Co. v. Connect Communications Corp.,* 225 F.3d 942, 946 (8th Cir.2000). The rationale makes good sense. As Verizon points out, a state commission's authority to approve or reject an interconnection agreement (based on its compliance with federal law) would itself be undermined if the commission lacked the authority to determine in the first instance the meaning of the agreement it has approved. A decision-maker in some other forum might ascribe to the agreement a meaning that differs from what the commission believed it was approving—indeed, the agreement as

(mis)interpreted might be an agreement that the commission would never have approved. Thus, as the FCC has ruled, § 252 empowers state commissions to interpret and enforce existing agreements. When they do so, they make "determinations" subject to review in federal district court for compliance with §§ 251 and 252. *See* 47 U.S.C. § 252(e)(6).

Verizon alleges, moreover, that the *Second WorldCom Order* interpreting and enforcing its agreement does not comply with the requirements of §§ 251 and 252. In particular, Verizon points out that the 1996 Act grants ILECs the statutory right to "negotiate and enter into a binding agreement with the requesting" CLECs, and to do so "without regard to the standards set forth in" § 252(b) and (c).[3] 47 U.S.C. § 252(a)(1). Federal law thus gives Verizon the right to insist that it be held only to the terms of the interconnection agreement to which it actually agreed. Verizon claims that the PSC misinterpreted the terms of its agreement with WorldCom, and that enforcement of its misinterpretation would effectively impose terms inconsistent with the parties' negotiated terms, modifying the agreement in contravention of § 252(a)(1). Accordingly, Verizon has stated a cause of action under § 252(e)(6).[4]

The PSC based its *Second WorldCom Order* on its determination of the parties' intent. Resolution of Verizon's complaint may thus implicate issues of state contract law. On the other hand, it may not.[5] Re-

---

**3.** The commissioners of the PSC contend that the 1996 Act "creates a duty, not a right" for an ILEC such as Verizon. PSC Reply at 14, 18. In fact, it creates both. It imposes on an ILEC the duty to negotiate and enter into interconnection agreements upon request. 47 U.S.C. § 251(c)(1). However, it also gives an ILEC the right to fulfill its duty by negotiating the terms of such agreements on its own, without regard to the 1996 Act's substantive standards. *Id.* § 252(a)(1).

**4.** Because the Court finds that the 1996 Act confers on Verizon a private cause of action under § 252(e)(6), it need not address the commissioners' argument that, absent such a cause of action, Verizon has failed to state a claim otherwise cognizable under 28 U.S.C. § 1331.

**5.** An interconnection agreement is not an ordinary private contract. It exists solely by virtue of the 1996 Act; it would appear, therefore, to be "a creature of federal law." Peter

gardless, to the extent Verizon seeks review of the PSC's application of state—rather than federal—law, the substantial evidence standard will govern this Court's review of the *Second WorldCom Order.* *See GTE South, Inc. v. Morrison,* 199 F.3d 733, 745 (4th Cir.1999)(designating *de novo* standard for review of a state commission's interpretation of federal law, but substantial evidence standard for all other determinations).

### b. *Against Core*

 Core argues that Verizon's claim against it must be dismissed as untimely because: (1) any such claim rests not on the *Second WorldCom Order,* dated June 11, 1999, but rather on the *Core Letter Order,* dated June 13, 2001; (2) the applicable limitations period is thirty days; and (3) Verizon waited until it filed its amended complaint, on August 30, 2002, to seek judicial review of the *Core Letter Order.* As with the defense of res judicata, a defendant may properly assert a limitations defense through a Rule 12(b)(6) motion to dismiss whenever the relevant facts appear on the face of the complaint. *United States v. Westvaco Corp.,* 144 F.Supp.2d 439, 441–42 (D.Md.2001); *see also* 5A Charles Alan Wright & Arthur R. Miller,

Federal Practice and Procedure § 1357, at 352–54 (2d ed.1990).

Here, the relevant facts appear, but they do not support Core's argument. Even if Verizon's claim against Core rested solely on the *Core Letter Order,* the applicable limitations period is four years, not thirty days.

 Maryland law, as Core notes, does set a thirty-day limit for filing a petition for judicial review of an administrative agency order—the state cause of action most analogous to that under § 252(e)(6). Md. Rule 7–203(a)(2002). A federal cause of action, however, borrows an analogous state limitations period only if federal law supplies no controlling limitations period. *See Manning v. Fairfax County Sch. Bd.,* 176 F.3d 235, 237 (4th Cir.1999)(citing *County of Oneida v. Oneida Indian Nation,* 470 U.S. 226, 240, 105 S.Ct. 1245, 84 L.Ed.2d 169 (1985)). And although the 1996 Act itself specifies no period of limitations, the general federal statute of limitations provides: "Except as otherwise provided by law, a civil action arising under an Act of Congress enacted after the date of the enactment of this section may not be commenced later than 4 years after the cause of action accrues." 28 U.S.C. § 1658(a).[6] Congress enacted

---

W. Huber et al., Federal Telecommunications Law 76 (2d ed. Supp.2002).

It is federal law that requires that it be negotiated, that specifies the substantive obligations that it must effectuate, and that gives state commission authority to approve and to interpret it. It is also federal law (in particular, section 252(i)) that requires that an incumbent make the same agreement available on the same terms to other parties. In all these respects, an interconnection agreement is part and parcel of the federal regulatory scheme and bears no resemblance to an ordinary, run-of-the-mill private contract. Indeed, an interconnection agreement is functionally no different from a federal tariff, and it is well estab-

lished that decisions as to the proper interpretation of a federal tariff arise under federal law.

*Id.* It may well be, then, that determination of the parties' intent requires application of federal (common?) law.

6. The Sarbanes–Oxley Act of 2002, Pub.L. No. 107–204, § 804(a), 116 Stat. 745, 801 (2002), recently amended § 1658 by redesignating the quoted language as subsection (a) and adding subsection (b). The amendment, which established a distinct federal statute of limitations for certain causes of action arising under the securities laws (and commenced on or after July 30, 2002), left the text of what is now subsection (a) undisturbed.

§ 1658(a) on December 1, 1990. *See* Judicial Improvements Act of 1990, Pub.L. No. 101–650, § 313(a), 104 Stat. 5089, 5114 (1990). Needless to say, congressional enactment of the 1996 Act postdates enactment of § 1658(a).

Yet, as Core also points out, the 1996 Act only amended the Telecommunications Act of 1934, which predates § 1658(a). Furthermore, "the phrase 'an Act of Congress enacted' after 1990 is not equivalent to 'an Act of Congress enacted or amended' after that year." *Madison v. IBP, Inc.*, 257 F.3d 780, 798 (8th Cir.2001), *vacated on other grounds*, —— U.S. ——, 122 S.Ct. 2583, 153 L.Ed.2d 773 (2002). This distinction, however, matters—if at all—only insofar as the post–1990 act amending a pre–1990 act creates no new cause of action.[7] When the amendment itself cre-

---

**7.** The application of § 1658 has proved especially nettlesome in the context of the Civil Rights Act of 1866, as amended, 42 U.S.C. § 1981. As originally enacted in 1866 (or reenacted in 1870 after ratification of the Fourteenth Amendment), § 1981 provided in relevant part that "[a]ll persons ... shall have the same right ... to make and enforce contracts ... as is enjoyed by white citizens." In *Patterson v. McLean Credit Union*, 491 U.S. 164, 176–77, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989), the Supreme Court held that § 1981 only granted two discrete rights: the right to make contracts, which "extends only to the formation of the contract, but not to problems that may arise later from the conditions of continuing employment," and the right to enforce contracts, which "embraces protection of a legal process, and of a right of access to legal process, that will address and resolve contract-law claims without regard to race." *Id.* Through the Civil Rights Act of 1991, Congress amended § 1981, redesignating the original text as § 1981(a) and adding subsections (b) and (c). Subsection (b), effectively overruling *Patterson*, provides that "the term 'make and enforce contracts' includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." Thus, under the amended § 1981, an employee may bring a cause of action against an employer for racially discriminatory conduct that occurs *after* the contractual employment relationship has been formed; under the unamended § 1981, an employee could not.

Neither originally, nor as amended, does § 1981 contain its own statute of limitations. Consequently, prior to the law's amendment in 1991, courts applied the most analogous state limitations period. *See Goodman v. Lukens Steel Co.*, 482 U.S. 656, 660, 107 S.Ct. 2617, 96 L.Ed.2d 572 (1987)("Because § 1981 ... does not contain a statute of limi-

tations, federal courts should select the most appropriate or analogous state statute of limitations."). Now, however, when a plaintiff brings a cause of action to recover for discriminatory treatment *during the course of employment*, federal courts disagree whether state law or § 1658 determines the period of limitations. *Compare, e.g., Jones v. R.R. Donnelley & Sons Co.*, 305 F.3d 717, 728 (7th Cir.2002)(holding that state law sets the limitations period); *Madison*, 257 F.3d at 798 (same); *Zubi v. AT&T Corp.*, 219 F.3d 220, 225 (3d Cir.2000)(same) *with Harris v. Allstate Ins. Co.*, 300 F.3d 1183, 1192 (10th Cir.2002)(holding that § 1658 governs). Despite this disagreement in outcome, all federal courts of appeals that have addressed the issue agree on the relevant inquiry, viz.: does such a cause of action "arise under" § 1981(a) or § 1981(b)? Thus, the critical question is not whether the Civil Rights Act of 1991 "enacted" or "amended" the Civil Rights Act of 1866; indeed, it obviously did only the latter. Rather, the critical question is whether the Civil Rights Act of 1991 created a new cause of action, independent of the Civil Rights Act it amended. *See Jones*, 305 F.3d at 726–27; ("Thus, it is 'only when Congress establishes a new cause of action without reference to preexisting law that § 1658 applies.'")(quoting *Zubi*, 219 F.3d at 225); *Harris*, 300 F.3d at 1190 ("In short, the meaning of § 1658 is quite simple: whenever Congress, after December 1990, passes legislation that creates a new cause of action, the catchall statute of limitations applies to that cause of action."); *Madison*, 257 F.3d at 798 ("[T]he 1991 amendments to § 1981 did not create a new cause of action, and ... the four year statute of limitations in § 1658[is] not applicable to cases brought under § 1981.") (citing *Zubi*, 219 F.3d at 225–26); *Zubi*, 219 F.3d at 225 ("It is ... only when Congress establishes a new cause of action without

ates the cause of action upon which the plaintiff sues, without reference to the preexisting act, the cause of action clearly "aris[es] under" the post–1990 amendment, and the general federal four-year statute of limitations applies.

Verizon's cause of action under § 252(e)(6) cannot but "arise under" the 1996 Act. No remotely similar cause of action existed earlier. The pre–1996 Telecommunications Act imposed no duty on telecommunications carriers to interconnect, nor authorized state commissions to approve or reject interconnection agreements. The PSC "determination" that Verizon challenges could not have been made prior to the enactment of the 1996 Act. *See* 47 U.S.C. § 252(e)(6). Therefore, § 1658(a), not Maryland law, fixes the period of limitations. *See Bell Atlantic–Pennsylvania, Inc. v. Pa. Pub. Util. Comm'n,* 107 F.Supp.2d 653, 668 (E.D.Pa.2000)(reaching the same conclusion). And Verizon's claim against Core, even if dependent exclusively on the *Core Letter Order,* is timely.

■■■ Nevertheless, Core asks alternatively that the Court exercise its discretion to drop it as a party from the instant proceeding under Rule 21, which provides in relevant part: "Parties may be dropped ... by order of the court on motion of any party or of its own initiative at any stage of the action and on such terms as are just." Despite its title, "Misjoinder and Non–Joinder of Parties," courts agree that a party may properly seek relief under Rule 21 even in the absence of improper joinder. *See CVI/Beta Ventures, Inc.,* 896 F.Supp. at 506 (citing *Wyndham Assocs. v. Bintliff,* 398 F.2d 614, 618 (2d Cir.1968)). And, indeed, Core does not suggest that it has been improperly joined in this action. Rather, Core maintains that its late joinder (Verizon formally served Core on Sep-

tember 27, 2002, with a summons and the amended complaint) and the Court's current schedule (Verizon has already filed a motion for summary judgment) unfairly hobble its defense. Verizon, moreover, concurs, and has consented to Core's dismissal. Accordingly, the Court will grant Core's Rule 21 motion and drop Core as a defendant, without prejudice to the claims or defenses of any party (including Core's limitations and res judicata defenses)..

### 2. Cause of Action Under § 1983 of the Civil Rights Act of 1871 Against the PSC Commissioners

■■■ Section 1983 provides a cause of action for any person whose federal rights, whether constitutional or statutory, have been violated by a state actor under color of state law. 42 U.S.C. § 1983. It creates no rights; rather, it supplies a remedy for rights established elsewhere in federal law. *See Chapman v. Houston Welfare Rights Org.,* 441 U.S. 600, 617, 99 S.Ct. 1905, 60 L.Ed.2d 508 (1979)("[O]ne cannot go into court and claim a 'violation of § 1983'—for § 1983 by itself does not protect anyone against anything."). A plaintiff may lay claim to this remedy only if: (1) the statute at issue creates a federal right; and (2) Congress has not foreclosed private enforcement of the right under § 1983, either expressly in the statute itself, "or impliedly, by creating a comprehensive enforcement scheme that is incompatible with individual enforcement under § 1983." *Blessing v. Freestone,* 520 U.S. 329, 340–41, 117 S.Ct. 1353, 137 L.Ed.2d 569 (1997).

■■■ Three criteria guide the determination whether a statutory provision gives rise to a federal right: first, Congress must have intended that the provision benefit the plaintiff; second, the asserted right must not be so vague and amorphous

reference to preexisting law that § 1658 ap-

plies.").

that its enforcement would strain judicial competence; and third, the provision must unambiguously impose a binding obligation on the states. *Id.* As to the third criterion, in other words, "the provision giving rise to the asserted right must be couched in mandatory, rather than precatory, terms." *Id.* at 341, 117 S.Ct. 1353.

Verizon claims a right under § 252(a)(1) to negotiate a binding contract with CLECs. Congress clearly enacted this provision specifically for the benefit of an ILEC such as Verizon and its competitors. It states that "an *incumbent local exchange carrier* may negotiate and enter into a binding agreement with the requesting telecommunications carrier or carriers." 47 U.S.C. § 252(a)(1)(emphasis added). The 1996 Act, as a whole, obviously also benefits the consumer public at large, as the commissioners of the PSC argue. Their argument, however, sweeps too broadly. Congress no doubt intends its every act to benefit the public at large (even if some members of the public may wish Congress would bestow its munificence elsewhere). The particular provision at issue here, however, confers a particular benefit on a particular class of persons. And Verizon belongs to that class.

Moreover, the enforcement of the right Verizon asserts hardly strains judicial competence. Verizon essentially asks the Court to decide whether the PSC has misconstrued a written agreement and to enforce that agreement, properly construed. Interpretation and enforcement of written agreements are traditional judicial functions.

Finally, the right granted in § 252(a)(1) unambiguously imposes a binding obligation on state commissions and their commissioners. To be sure, the law permits, rather than requires, ILECs and CLECs to negotiate and enter into an interconnection agreement relatively free from direct regulatory interference. 47 U.S.C. § 252(a)(1). If an ILEC and a CLEC decide to do so, a state commission must approve their negotiated agreement unless it "discriminates against a telecommunications carrier not a party to [it]," or its implementation "is not consistent with the public interest, convenience, and necessity." 47 U.S.C. § 252(e)(2)(A). The PSC's approval of the agreement at issue made it finally binding on the private parties involved. Exercising federally-granted authority, the PSC validated the agreement. The PSC cannot subsequently unbind what it has bound. The PSC *can* misinterpret. *See supra.* It *cannot* and *must not* enforce its misinterpretation, if contrary to the binding terms of the approved agreement. Otherwise, Verizon's right under § 252(a)(1) would be meaningless.

The 1996 Act, therefore, creates a federal right. And Congress has not expressly prohibited a § 1983 action to enforce that right. Nevertheless, "[w]hen the remedial devices provided in a particular Act are sufficiently comprehensive, they may suffice to demonstrate congressional intent to preclude the remedy of suits under § 1983." *Middlesex County Sewerage Auth. v. Nat'l Sea Clammers Ass'n*, 453 U.S. 1, 20, 101 S.Ct. 2615, 69 L.Ed.2d 435 (1981).

In *Middlesex County Sewerage Authority*, the Supreme Court found the "unusually elaborate enforcement provisions" of the Federal Water Pollution Control Act and the Marine Protection, Research, and Sanctuaries Act of 1972 sufficiently comprehensive to supplant § 1983 actions. *Id.* at 13–14, 101 S.Ct. 2615. The statutes established the right to waters free of pollutants beyond certain specified amounts. *Id.* at 11–12, 101 S.Ct. 2615. Both statutes, the Court observed, allowed for non-compliance orders, civil suits, and criminal penalties. *Id.* at 13–14, 101 S.Ct.

2615. Especially because the statutes authorized specific enforcement actions by private, injured citizens, the Court concluded that Congress had not intended to authorize additional actions under § 1983. *Id.* at 14–15, 101 S.Ct. 2615.

In *Smith v. Robinson,* 468 U.S. 992, 104 S.Ct. 3457, 82 L.Ed.2d 746 (1984), the Supreme Court also found that the Education of the Handicapped Act ("EHA")(now the Individuals with Disabilities Education Act) established an enforcement scheme so comprehensive as to preclude a § 1983 action. *Id.* at 1013, 104 S.Ct. 3457. The Court noted that the EHA sought to ensure the right of certain disabled children to a "free appropriate public education" through elaborate administrative procedures and, ultimately, federal judicial review at the behest of an aggrieved child or the child's parents or guardian. *Id.* at 1009–11, 104 S.Ct. 3457. Because a § 1983 action would "render superfluous most of the detailed procedural protections outlined in the" EHA itself, the Court concluded that Congress had intended to foreclose such an action.[8] *Id.* at 1011–13, 104 S.Ct. 3457.

By contrast, in *Wright v. City of Roanoke Redevelopment & Housing Authority,* 479 U.S. 418, 107 S.Ct. 766, 93 L.Ed.2d 781 (1987), the Supreme Court held that the Housing Act and the Brooke Amendment did not preclude the use of § 1983 to enforce rights that the law creates. *Id.* at 429, 107 S.Ct. 766. In particular, the Court held that low-income tenants in public housing projects could bring suit under § 1983 to challenge housing authorities' calculations of the amount of rent they owe. *Id.* at 427–29, 107 S.Ct. 766. In reaching its conclusion, the Court stressed that the statutes at issue in both *Smith*

and *Middlesex County Sewerage Authority* "provided for private judicial remedies, thereby evidencing congressional intent to supplant the § 1983 remedy," whereas the Housing Act and Brooke Amendment provided no private judicial remedy. *Id.* at 427, 107 S.Ct. 766. Instead, the Housing Act provided only local, administrative grievance procedures. *Id.* And the availability of state administrative remedies alone, the Court stated, "does not ordinarily foreclose resort to § 1983." *Id.* at 427–28, 107 S.Ct. 766.

Similarly, in *Blessing,* the Supreme Court determined that Title IV–D of the Social Security Act ("Title IV–D")—insofar as it gave rise to any individual rights—did not establish an enforcement scheme comprehensive enough to close the door to § 1983 actions. 520 U.S. at 348, 117 S.Ct. 1353. Again, the Court distinguished the statutes at issue in *Smith* and *Middlesex County Sewerage Authority,* on the same grounds: "Unlike the federal programs at issue in those cases, Title IV–D contains no private remedy—either judicial or administrative—through which aggrieved persons can seek redress." *Id.*

Recognizing that "[t]he Supreme Court has repeatedly emphasized that the availability of [a private right of action] strongly suggests a Congressional intent to preclude resort to § 1983," the Fourth Circuit recently held that Congress meant to preclude the use of § 1983 for the protection of overtime compensation rights secured by the Fair Labor Standards Act ("FLSA"). *Kendall v. City of Chesapeake,* 174 F.3d 437, 440–43 (4th Cir.1999). The establishment of a private FLSA action provided particularly "significant evidence of Congress's intent." *Id.* at 443.

---

**8.** Although Congress has legislatively overruled much of the *Smith* holding, *see Sellers v. Sch. Bd. of Manassas,* 141 F.3d 524, 530 (4th Cir.1998), the Court's § 1983–preclusion analysis remains valid. *See Blessing,* 520 U.S. at 347, 117 S.Ct. 1353 (discussing the reasoning of *Smith* with approval).

■ The 1996 Act, as the Court has found, permits a carrier to enforce its right to a negotiated, binding interconnection agreement, in the first instance, before a state administrative agency. *See supra.* It then provides for immediate review of that administrative decision before a federal district court. *See supra.* If its remedial scheme lacks some procedural detail, it nevertheless confers on carriers a private right of action. Moreover, the 1996 Act "places no restriction on the relief a court can award." *Verizon Md. Inc.*, 122 S.Ct. at 1761. Nor does it appear to restrict "whom the suit is to be brought against— the state commission, the individual commissioners, or the carriers benefiting from the state commission's order." *Id.* The 1996 Act provides ample—and sufficiently comprehensive—means for vindicating the right at issue here. Therefore, Congress cannot have intended to allow enforcement under § 1983 as well.

The "savings clause" of the 1996 Act does not suggest otherwise. The clause provides: "This Act and the amendments made by this Act shall not be construed to modify, impair, or supersede Federal, State, or local law unless expressly so provided in such Act or amendments." Pub.L. No. 104–104, § 601(c)(1), 110 Stat. 143 (1996)(reprinted in 47 U.S.C. § 152, historical and statutory notes).[9] The implied foreclosure of a cause of action under § 1983 as a remedy for a violation of the 1996 Act in no way modifies, impairs, or supersedes § 1983. A "savings clause" can only save what already exists. And prior to the 1996 Act, the right upon which Verizon would base its § 1983 action did not exist. Thus, contemporaneous creation of the right and a remedial scheme to vindicate it exclusive of § 1983 leaves the pre-existing statutory force of § 1983 un-

changed. *See Middlesex County Sewerage Auth.*, 453 U.S. at 20 n. 31, 101 S.Ct. 2615 (finding that similar savings clauses could not "preserve" § 1983 actions when the overall remedies expressly provided by the statutes were sufficiently comprehensive).

D. *The Tenth Amendment*

■ Congress passed § 252 of the 1996 Act pursuant to its authority under the Commerce Clause to "regulate Commerce with foreign Nations, and among the several States . . . ." U.S. Const. art. I, § 8, cl. 3. The Commerce Clause grants Congress plenary power to regulate activities that substantially affect interstate commerce. *United States v. Lopez*, 514 U.S. 549, 558–59, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995). The 1996 Act, in general, and § 252, in particular, address the telecommunications market—an agglomeration of activities whose overall effect on interstate commerce can hardly be overestimated. Therefore, the subject matter of § 252—the mediation, arbitration, and approval of agreements between ILECs and CLECs—falls well within the scope of congressional authority.

Even so, the Tenth Amendment, as an express guarantee of state sovereignty, limits the ways in which Congress may implement otherwise valid legislation. *New York*, 505 U.S. at 155–57, 112 S.Ct. 2408. For example, the Tenth Amendment prohibits Congress from directly commanding the states to pass or enforce laws: "The Federal Government may not compel the States to enact or administer a federal regulatory program." *Id.* at 188, 112 S.Ct. 2408. Likewise, Congress cannot issue such mandates to state executive officers. *Printz v. United States*, 521 U.S.

---

**9.** Although not codified in § 152 itself, the "savings clause" was enacted into law and is binding authority.

898, 935, 117 S.Ct. 2365, 138 L.Ed.2d 914 (1997).

While Congress cannot coerce, it can induce. *See FERC v. Mississippi,* 456 U.S. 742, 766, 102 S.Ct. 2126, 72 L.Ed.2d 532 (1982)(asserting that "valid federal enactments may ... be designed to induce state action in areas that otherwise would be beyond Congress' regulatory authority"). Thus, if "federal regulation of private activity is within the scope of the Commerce Clause, ... Congress [may] offer States the choice of regulating that activity according to federal standards or having state law pre-empted by federal regulation." *New York,* 505 U.S. at 173–74, 112 S.Ct. 2408; *see also FERC,* 456 U.S. at 767 n. 30, 102 S.Ct. 2126 ("Congress may condition the validity of State enactments in a pre-emptible area on their conformity with federal law ...."); *Hodel v. Va. Surface Mining & Reclamation Ass'n,* 452 U.S. 264, 288–89, 101 S.Ct. 2352, 69 L.Ed.2d 1 (1981)(approving the use of such inducement to establish "a program of cooperative federalism").

The commissioners of the PSC argue that § 252 of the 1996 Act offers Maryland no choice but to enforce the federal telecommunications program.[10] It does not. Examined under the analytical paradigm employed in *New York,* § 252 presents states with the following alternatives: either (1) mediate, arbitrate, approve, or reject interconnection agreements in accord with federal standards; or (2) cede authority to take such action to the FCC.

47 U.S.C. § 252(e)(5). If Congress could constitutionally enact the second option alone, and so preempt all state authority over interconnection agreements, then Congress can also condition its preemption on the states regulating the agreements in conformity with its wishes. The Court has already determined that Congress may regulate interconnection agreements under the Commerce Clause. In exercising this authority, Congress could also preempt all state regulation of interconnection agreements: "[T]he Commerce Clause empowers Congress to prohibit all—and not just inconsistent—state regulation of" private activity affecting interstate commerce. *Hodel,* 452 U.S. at 290, 101 S.Ct. 2352; *see also FERC,* 456 U.S. at 764, 102 S.Ct. 2126 (noting that "the commerce power permits Congress to pre-empt the States entirely in the regulation of private utilities"). Therefore, § 252 does not offend the Tenth Amendment.

The choice that § 252 offers may be (somewhat) unsavory, yet it remains a real choice. The power to regulate local telecommunications has been vested in the states for decades. And states have a strong interest in providing telecommunications services to their citizens at competitive rates. Nevertheless, the choice to regulate as Congress dictates leaves a far less bitter aftertaste than the commissioners suggest. Even if the PSC should choose not to exercise its authority under the 1996 Act, it would hardly "abdicat[e]

---

**10.** The commissioners also argue that § 252(e)(4) deprives Maryland of jurisdiction to review certain actions of its own administrative agency. To so strip a state of its judicial authority, they maintain, independently affronts its sovereignty and violates the Tenth Amendment. Yet insofar as Maryland has validly chosen to regulate interconnection agreements under the 1996 Act, it has chosen to accept the provisions of the 1996 Act *in toto*—including the grant of exclusive federal

district court jurisdiction to review "the action of a State commission in approving or rejecting an agreement." 47 U.S.C. § 252(e)(4). At any rate, the constitutionality of § 252(e)(4) has no bearing on the validity of the instant claim. Even if state court review cannot be preempted, 28 U.S.C. § 1331 permits Verizon to bring its federal-question claim before a federal court. *See Verizon Md. Inc.,* 122 S.Ct. at 1759.

... all authority over local telephone competition." PSC Motion at 15.

In the first place, the 1996 Act expressly reaffirms the right of states to prescribe and enforce any supplemental regulations—including regulations setting retail rates paid by consumers and even regulations stimulating competition in the provision of intrastate telephone exchange services—consistent with federal law. 47 U.S.C. § 261(b), (c). States may do so, moreover, even if they choose not to participate in implementing the 1996 Act. *Id. See FERC*, 456 U.S. at 783, 102 S.Ct. 2126 (O'Connor, J., concurring in the judgment in part and dissenting in part)(approving a program of cooperative federalism so long as states that choose not to administer the federal regulatory program may still supplement the federally-administered program with consistent state laws).

In the second place, § 252 itself offers states the choice on a case-by-case basis. If the PSC decides to assume authority to act in one proceeding under § 252, it may decline that authority to act in another, then reassume it to act in yet another. 47 U.S.C. § 252(e)(5). Thus, whenever the PSC wearies of the federal burdens it has willingly (if grudgingly) shouldered, it may transfer them to the FCC; and if it wishes, in some subsequent proceeding, to resume those same burdens, it may still do so.

## CONCLUSION

For the foregoing reasons, a separate order will be issued: DENYING the motion to dismiss of the defendant commissioners as to Counts I and II; GRANTING the motion to dismiss of the defendant commissioners as to Count III; DENYING the motions to dismiss of defendants Global and Core; and GRANTING the motion of defendant Core to be dropped as a defendant from this lawsuit, without prejudice to any party.

## ORDER

For the reasons stated in the Memorandum Opinion of even date, it is, this 19th day of November, 2002, hereby ORDERED:

1. That the motion of Defendants Catherine I. Riley, Claude M. Ligon, J. Joseph Curran III, Gail C. McDonald, and Ronald Guns to dismiss the Amended Complaint BE, and it hereby IS, DENIED as to Counts I and II;

2. That the motion of Defendants Catherine I. Riley, Claude M. Ligon, J. Joseph Curran III, Gail C. McDonald, and Ronald Guns to dismiss the Amended Complaint BE, and it hereby IS, GRANTED as to Count III;

3. That the motions of Defendants Global NAPS, Inc., and Core Communications, Inc., to dismiss the Amended Complaint BE, and they hereby ARE, DENIED;

4. That the motion of Defendant Core Communications, Inc., to be dropped as a party from this action, pursuant to Federal Rule of Civil Procedure 21, BE, and it hereby IS, GRANTED, without prejudice to the claims or defenses of any Party; and

5. That the Clerk of the Court send copies of this Order and Memorandum Opinion to counsel for the Parties.