VERIZON MARYLAND INC., f/k/a
BELL ATLANTIC–MARYLAND,
INC. Plaintiff,

v.

RCN TELECOM SERVICES, INC.,
f/k/a RCN Telecom Services of Maryland Inc., et al., Defendants.

No. CIV.S–99–2061.

United States District Court,
D. Maryland,
Northern Division.

March 5, 2003.

James P. Garland, Miles and Stockbridge PC, Baltimore, MD, Mark L. Evans, Sean A. Lev, Aaron M. Panner, Kellogg Huber Hansen Todd and Evans LLC, Washington, DC, for Plaintiff.

John R. Harrington, Darryl M. Bradford, Jenner and Block, Chicago, IL, Jodie L. Kelley, Elena Nicole Broder–Feldman, Jenner and Block, Washington, DC, Glen Keith Allen, Piper Rudnick LLP, Baltimore, MD, Michael L. Shor, Robin L. Redfield, Richard M. Rindler, Swidler Berlin Shereff Friedman LLP, Washington, DC, Matthew W. Nayden, Kelly Culp Hoelzer, Ober Kaler Grimes and Shriver, Baltimore, MD, Michael Albert McRae, AT & T Law Department, Oakton, VA, Susan Stevens Miller, Maryland Public Service Commission, Baltimore, MD, Thomas M. DiBiago, Kaye A. Allison, Jennifer Lilore Huesman, Office of the United States Attorney, Baltimore, MD, Theodore C. Hirt, David T. Zaring, U.S. Department of Justice Civil Division Federal Programs, Rachel J. Hines, United States Department of Justice, Washington, DC, Michael J. Travieso, Theresa V. Czarski, Baltimore, MD, David A. Konuch, Kelley Drye and Warren LLP, Washington, DC, Ira T. Kasdan, Kelley Drye and Warren LLP, Vienna, VA, James R. J. Scheltema, Columbia, MD, for Defendants.

Chan Park, Akin Gump Strauss Hauer and Feld LLP, McLean, VA, for Movant.

## MEMORANDUM OPINION

SMALKIN, District Judge.

The plaintiff, Verizon Maryland Inc. ("Verizon"), formerly known as Bell Atlantic–Maryland, Inc., filed an amended complaint against the defendants alleging that the Public Service Commission of Maryland ("PSC") issued an order that violates the Telecommunications Act of 1996 ("the 1996 Act"), Pub.L. 104–104, 110 Stat. 56 (codified as amended in scattered sections of 47 U.S.C.). Now before the Court are the cross-motions for summary judgment of: (1) the plaintiff Verizon; (2) defendants Catherine I. Riley, Claude M. Ligon, J. Joseph Curran III, Gail C. McDonald, and Ronald Guns, all in their official capacities as members of the PSC (collectively, "the commissioners"); (3) defendant RCN Telecom Services, Inc. ("RCN Telecom"); (4) defendant Starpower Communications, LLC ("Starpower"); (5) defendant TCG–Maryland; (6) defendant Global NAPS, Inc. ("Global"); and (7) intervenor-defendants MCI WorldCom Communications, Inc., and MCImetro Access Transmission Services LLC (collectively, "WorldCom"). The issues have been fully briefed by the parties, and no oral hearing is necessary. Local Rule 105.6 (D.Md.).

## BACKGROUND

Congress enacted the 1996 Act to promote competition in local telecommunications markets. See AT & T Corp. v. Iowa Utils. Bd., 525 U.S. 366, 371, 119 S.Ct. 721, 142 L.Ed.2d 835 (1999). Toward that end, the 1996 Act imposes various obligations on incumbent local exchange carriers ("ILECs"), including a duty to share their networks with competing local exchange carriers ("CLECs"). See 47 U.S.C. § 251(c). When a CLEC seeks access to the market, the ILEC must "provide ... interconnection with" its network. Id. § 251(c)(2). The carriers must then "establish reciprocal compensation arrangements for the transport and termination of telecommunications." Id. § 251(b)(5).

An ILEC "may negotiate and enter into a binding agreement" with a CLEC to fulfill the duties imposed by § 251(b) and (c), but "without regard to the standards set forth in" those provisions. Id. § 252(a)(1). The parties must negotiate in good faith. Id. § 251(c)(1). If private negotiations fail, either party may petition

the relevant state commission to arbitrate open issues. *Id.* § 252(b).

An ILEC may also prepare and file with a state commission a statement of generally available terms ("SGAT") that the ILEC offers to CLECs to comply with the requirements of §§ 251 and 252. *Id.* § 252(f)(1). If an ILEC submits a SGAT, the state commission must review it and either approve or disapprove it. *Id.* § 252(f)(3)-(4). The state commission may not approve a SGAT unless it meets certain requirements of the 1996 Act. *Id.* § 252(f)(2). The state commission may also establish and enforce requirements of state law in its review of a SGAT. *Id.* The submission or approval of a SGAT, however, does not relieve an ILEC of its duty to negotiate the terms and conditions of an agreement under § 251. *Id.* § 252(f)(5). Nevertheless, an ILEC and a CLEC may adopt the terms and conditions of an approved SGAT as their interconnection agreement. *Id.* § 252(i).

Once an interconnection agreement is in place, whether negotiated, mediated, or arbitrated, the parties must submit it to the state commission for approval or rejection. *Id.* § 252(e)(1). The state commission must ensure that each agreement is consistent with certain requirements of the 1996 Act, but may also enforce requirements of state law, such as intrastate quality service standards. *Id.* § 252(e)(2), (3). A state commission may reject a voluntarily negotiated agreement only if the agreement discriminates against a carrier not a party, or if its implementation "is not consistent with the public interest, convenience, and necessity." *Id.* § 252(e)(2)(A). A state commission may reject an agreement adopted by arbitration only if the agreement fails to meet the requirements of §§ 251 and 252(d) and FCC regulations issued thereunder. *Id.* § 252(e)(2)(B). A party aggrieved by a "determination" of a state commission under § 252 may bring an action in federal district court "to determine whether the agreement or statement meets the requirements" of §§ 251 and 252. *Id.* § 252(e)(6).

In this case, Verizon, the ILEC in Maryland, negotiated an interconnection agreement (the "WorldCom agreement") with MFS Intelenet of Maryland, Inc., later acquired by intervenor-defendant WorldCom. The PSC approved the agreement on October 9, 1996. Neither party sought review in federal district court (or elsewhere). Three other defendant CLECs— RCN Telecom, Starpower, and TCG–Maryland—all subsequently entered into voluntary agreements with Verizon in relevant part substantively identical to the WorldCom agreement. The PSC approved them all; no one sought review. Adopting Verizon's PSC-approved SGAT, Global, another defendant CLEC, entered into an agreement with Verizon in August 2000. On or around May 9, 2001, the PSC approved the Global–Verizon agreement.

Sometime after the PSC approved the WorldCom agreement, a dispute arose between Verizon and WorldCom over the terms of the reciprocal compensation arrangement. The agreement required reciprocal compensation for "local traffic." WorldCom agreement ¶¶ 1.44, 1.61, 5.7. When a Verizon customer would place a local call to a WorldCom customer, the caller would be using part of WorldCom's network, and Verizon would have to compensate WorldCom for such usage. The agreement set the rates of compensation. As it happened, several customers of WorldCom were internet service providers ("ISPs"), offering modem-based internet access to their own customers. The customers of the ISPs, through their computers, placed telephone calls to their ISPs, which then connected them to the internet. Needless to say, these ISP-bound calls tended to be longer than average local

calls, and many of the ISPs' customers used Verizon as their local telephone service provider. Thus, if this ISP-bound traffic were "local," Verizon would have to pay reciprocal compensation to WorldCom; if nonlocal, no reciprocal compensation would be due.

Around April 1997, Verizon informed WorldCom that it would no longer pay reciprocal compensation for telephone calls made by Verizon's customers to ISPs serviced by WorldCom. Verizon claimed that such calls were not "local traffic" because the ISPs were connecting customers to distant websites. WorldCom disputed Verizon's claim and filed a complaint with the PSC. On September 11, 1997, the PSC found in favor of WorldCom, ordering Verizon "to timely forward all future interconnection payments owed [WorldCom] for telephone calls placed to an ISP" and to pay WorldCom any reciprocal compensation that it had withheld pending resolution of the dispute. Am. Compl., Ex. D (the *"First WorldCom Order"*). Verizon appealed to a Maryland state court, which affirmed the PSC's order. *Bell Atl.-Md., Inc. v. Pub. Serv. Comm'n,* Civ. No. 178260 (Md. Cir. Ct. Montgomery County Mar. 26, 1998).

Subsequently, the FCC issued a ruling that categorized ISP-bound calls as nonlocal, but concluded that, absent a federal compensation mechanism, state commissions could construe interconnection agreements as requiring reciprocal compensation. *See IN RE IMPLEMENTATION OF THE LOCAL COMPETITION PROVISIONS OF THE TELECOMMUNICA-TIONS ACT OF 1996,* 1999 WL 98037, 14 F.C.C.R. 3689 (1999)(the *"ISP Order"*), vacated and remanded, *Bell Atl. Tel. Cos. v. FCC,* 206 F.3d 1 (D.C.Cir.2000).[1] Verizon filed a new complaint with the PSC, arguing that the *ISP Order* dictated that Verizon no longer had to provide reciprocal compensation for ISP-bound traffic. In a 3-to-2 decision, the PSC rejected Verizon's argument, concluding as a matter of state contract law that Verizon and WorldCom had agreed to treat ISP-bound calls as local traffic, subject to reciprocal compensation. *See* Am. Compl., Ex. A (the *"Second WorldCom Order"*).

Verizon filed an action in this Court to review the *Second WorldCom Order,* citing 47 U.S.C. § 252(e)(6) and 28 U.S.C. § 1331 as bases for jurisdiction. The original complaint named as defendants the PSC, its individual members in their official capacities, WorldCom, and five other CLECs. On motion of the PSC, this Court dismissed the complaint, holding that the doctrine of sovereign immunity precluded its exercise of subject-matter jurisdiction under either § 252(e)(6) or § 1331. A divided panel of the Fourth Circuit affirmed. *See Bell Atl.-Md., Inc. v. MCI Worldcom, Inc.,* 240 F.3d 279 (4th Cir.2001). Verizon petitioned the Supreme Court for a writ of certiorari.

On December 12, 2001, the Supreme Court granted certiorari in the matter of the *Second WorldCom Order. Verizon Maryland Inc. v. Public Service Comm'n of Maryland,* 534 U.S. 1072, 122 S.Ct. 679, 151 L.Ed.2d 591 (2001). Then, without

---

**1.** On remand, the FCC issued another ruling. *See In re Implementation of Local Competition Provisions in Telecommunications Act of 1996,* 16 F.C.C.R. 9151, 2001 WL 455869 (2001) (the *"ISP Remand Order"*). Although the *ISP Remand Order* no longer characterized ISP-bound calls as nonlocal, it nevertheless concluded that the 1996 Act did not require reciprocal compensation for such calls. It also established a transitional, prospective regime for intercarrier compensation, to take effect as pre-existing contracts expire. *See ISP Remand Order,* 16 F.C.C.R. at 9186–97 (¶¶ 77–94), 2001 WL 455869. Without vacating this ruling, the D.C. Circuit has remanded it to the FCC for reconsideration. *See WorldCom, Inc. v. FCC,* 288 F.3d 429 (D.C.Cir.2002).

dissent, it vacated the judgment of the Fourth Circuit. *See Verizon Md. Inc. v. Pub. Serv. Comm'n,* 535 U.S. 635, 122 S.Ct. 1753, 152 L.Ed.2d 871 (2002). The Court ruled, first, that a federal district court has subject-matter jurisdiction to entertain a claim that a state commission order interpreting and enforcing an interconnection agreement violates federal law. *Id.* at 1758. Although the Court declined to resolve the question whether § 252(e)(6) authorizes such review, it "agree[d] ... that even if § 252(e)(6) does not *confer* jurisdiction, it at least does not *divest* the district courts of their authority under 28 U.S.C. § 1331 to review the [PSC]'s order for compliance with federal law." *Id.*

Next, the Court held that the doctrine of sovereign immunity does not bar Verizon's claim because the (countervailing) doctrine of *Ex Parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), permits Verizon to proceed against the commissioners of the PSC in their official capacities. *Id.* at 1760. The Court asserted that Verizon's "prayer for injunctive relief—that state officials be restrained from enforcing an order in contravention of controlling federal law—clearly satisfies" the requirements of an *Ex Parte Young* suit. *Id.* It noted that Verizon's prayer for declaratory relief "seeks a declaration of the *past,* as well as the *future,* ineffectiveness of the [PSC]'s action, so that the past financial liability of private parties may be affected." *Id.* Nevertheless, because "no past liability of the State, or any of its commissioners, is at issue," the Court concluded that the prayer for declaratory relief likewise satisfies the strictures of *Ex Parte Young. Id.*

The Supreme Court remanded the case to the Fourth Circuit, which in turn remanded it to this Court for further proceedings. As soon as this Court assumed jurisdiction, Verizon filed the instant amended complaint. The amended complaint drops the PSC and WorldCom as defendants—the latter because it has filed for reorganization under Chapter 11 of the Bankruptcy Code. It substitutes the new PSC commissioners for their predecessors. It also adds Global as a defendant CLEC. Finally, the amended complaint adds a count asserting another cause of action as a remedy for the statutory violation Verizon alleges.

Count I of the amended complaint alleges that the PSC's decision in the *Second WorldCom Order* that ISP-bound calls constitute "local traffic" within the meaning of the relevant agreements is inconsistent with federal law and the parties' intent. Count II alleges that the PSC's concomitant decision to require reciprocal compensation for ISP-bound calls in instances where the parties could not agree on rules governing compensation for such traffic likewise violates federal law. Finally, Count III alleges that the *Second WorldCom,* issued by the commissioners acting in their official capacities under color of state law, deprives Verizon of its federal statutory rights in violation of § 1983 of the Civil Rights Act of 1871 (" § 1983").

As remedies, Verizon requests that this Court issue an order: (1) declaring the PSC's decision unlawful; (2) enjoining all defendants, and all parties acting in concert therewith, from seeking to enforce the decision against Verizon; and (3) requiring the commissioners of the PSC to order the defendant carriers to refund all moneys obtained from Verizon in reciprocal compensation fees for ISP-bound traffic. Am. Compl. at 13.

By order dated November 19, 2002, this Court dismissed Count III. *Verizon Md. Inc. v. RCN Telecom Servs., Inc.,* 232 F.Supp.2d 539, 559 (D.Md.2002). In so doing, this Court found—perhaps unnecessarily—that the decision of a state commission interpreting or enforcing an existing

interconnection agreement constitutes a "determination" subject to federal judicial review under 47 U.S.C. § 252(e)(6) [hereinafter § 252(e)(6) ]. *Id.* at 550–51.

### SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c); *see also Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Here, all the parties concede that no genuine issue of material fact exists; they dispute only matters of law.

### ANALYSIS

#### A. *Subject–Matter Jurisdiction*

■ If § 252(e)(6) merely creates a private right of action but does not expand the jurisdiction of the federal district courts, *see Verizon Md. Inc.,* 122 S.Ct. at 1759, some other jurisdictional basis must ground such a suit—most likely 28 U.S.C. § 1331. That provision states: "The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." It authorizes the district courts to hear "only those [claims] in which a well-pleaded complaint establishes *either* that federal law creates the cause of action

*or* that the plaintiff's right to relief *necessarily* depends on resolution of a substantial question of federal law." *Franchise Tax Bd. v. Constr. Laborers Vacation Trust,* 463 U.S. 1, 27–28, 103 S.Ct. 2841, 77 L.Ed.2d 420 (1983)(emphasis added).

#### 1. *Federally Created Cause of Action?*

■ In Counts I and II of its amended complaint, Verizon appears to assert three distinct claims: first, in Count I, it claims that the *Second WorldCom Order* violates the 1996 Act and FCC rulings issued thereunder by requiring payment of reciprocal compensation for ISP-bound calls; second, in Count I, it claims that the *Second WorldCom Order* violates the 1996 Act and FCC rulings issued thereunder by misinterpreting the terms of its agreement with WorldCom to require payment of reciprocal compensation for ISP-bound calls; and third, in Count II, it claims that the *Second WorldCom Order* violates the 1996 Act and FCC rulings issued thereunder by requiring payment of reciprocal compensation for ISP-bound calls whenever the issue is arbitrated or whenever a CLEC adopts Verizon's existing SGAT.[2] Verizon presses the second of these claims far more vigorously than the others.

#### a. *Federal Preemption*

■ If § 252(e)(6) creates a relevant private cause of action, it easily comprehends Verizon's first and third claims—

---

**2.** In its motion for summary judgment, the PSC argues that Count II must be dismissed under the law-of-the-case doctrine because: (1) this Court dismissed the corresponding count of Verizon's original complaint as unripe; (2) Verizon failed to challenge this ruling on appeal; and (3) Verizon has alleged no new facts that would merit reconsideration. PSC's Mot. for Summ. J. at 19–20; PSC's Reply at 10. Verizon *has,* however, filed a new complaint alleging new facts. Its amended complaint adds Global as a defendant and alleges that Global elected to adopt

the terms of Verizon's SGAT when entering into its interconnection agreement with Verizon. Am. Compl. ¶ 26. It alleges further that the PSC approved this SGAT-interconnection agreement on or around May 9, 2001. *Id.* As this Court noted when dismissing the original complaint, the claim at issue would ripen when "an interconnection agreement is in place" based on the SGAT. 10.20.1999 Mem. Op. at 23. Thus, the claim stated in Count II of the amended complaint is now ripe for judicial review.

garden-variety federal-preemption claims. It makes certain actions of a state commission reviewable in federal district court for compliance with the requirements of §§ 251 and 252 of the 1996 Act. Even if § 252(e)(6) does not create a relevant cause of action, Verizon has asserted identical claims under § 1983.[3] Thus, one federal law or another gives Verizon the right to bring its preemption claims. As the Supreme Court has held, there can be "no doubt that federal courts have jurisdiction under § 1331 to entertain such a suit." *Verizon Md. Inc.*, 122 S.Ct. at 1758.

### b. *Contract Misinterpretation: The 1996 Act, Federal Common Law, and "Federalized" State Law*

■ If § 252(e)(6) creates a private cause of action, it does not comprehend Verizon's second claim—a garden-variety contract claim. Verizon's argument to the contrary relies on a solecistic reading of the 1996 Act.[4] Verizon points, first, to its right to "negotiate and enter into a binding agreement with the requesting ... carriers without regard to the standards set forth in" § 251(b) and (c). 47 U.S.C. § 252(a)(1). It then construes the terms of such a "binding" agreement as "requirements" of § 252. Therefore, Verizon concludes, when a state commission misinterprets a voluntarily negotiated interconnection agreement and seeks to enforce its misinterpretation, the commission's action fails to "meet[ ] the requirements" of § 252—thus violating the 1996 Act and conferring on the aggrieved party a federal right of action to redress the violation. *Id.* § 252(e)(6). Verizon thus reads the 1996 Act to create a federal cause of action whenever a state commission (mis)determines what parties intended under their interconnection agreements.

The principal error of this reading lies in its identification of the terms of a carrier's voluntarily negotiated, binding agreement as "requirements" of § 252. The 1996 Act does mandate that an ILEC enter into an interconnection agreement with a requesting CLEC. *Id.* §§ 251(b), (c), 252(a), (b). It does not, however, mandate the specific terms of such an agreement. That is, the 1996 Act "does not set out specific conditions which one party could enforce against the other." *Ill. Bell Tel. Co. v. Worldcom Techs., Inc.*, 179 F.3d 566, 573 (7th Cir.1999). The specific reciprocal-compensation terms of a privately negotiated agreement are not requirements of the 1996 Act; they are private-law requirements that the parties themselves have agreed to impose upon themselves, and that do not have the dignity of public law enforceable within the "federal question" jurisdiction of the federal courts.

■ Therefore, regardless whether federal or state law empowers a state commission to arbitrate a dispute about the parties' self-imposed requirements, the commission's determination of the parties' *intent*—right or wrong—does not necessarily violate the 1996 Act. *See id.* at 572. If § 252(e)(6) confers a federal cause of action on a carrier aggrieved by such a determination, it strictly limits that cause of action to review of the commission's action for compliance with the requirements of §§ 251 and 252. And, it seems, a commission's determination that the parties agreed to require reciprocal compensation for ISP-bound traffic runs afoul of

---

**3.** This Court's dismissal of Verizon's § 1983 cause of action, even if erroneous, is immaterial. Analysis of Verizon's claims under § 1983 would differ only trivially from analysis under § 252(e)(6) and would lead to the same judgment.

**4.** To the extent this Court committed the same solecism in ruling on the motions to dismiss filed by the PSC and Global, *see Verizon Md. Inc.*, 232 F.Supp.2d at 551, 555, it now corrects its error.

§§ 251 and 252 only if: (1) the commission seeks to enforce such an agreement; *and* (2) §§ 251 and 252 (and FCC rulings thereunder) *prohibit* such an agreement. *See supra,* part A.1.a.

■ Verizon's claim that the PSC misinterpreted its agreement with WorldCom, however, ultimately alleges no more than that the PSC misapplied principles of Maryland contract law. Am. Compl. ¶ 36 ("The PSC's decision that Internet communications constitute 'local traffic' within the meaning of the [WorldCom] Agreement and Verizon's agreements with other private defendants is inconsistent ... with the language of those agreements ...."); *see also* Verizon's Mot. for Summ. J. at 11 ("This case is governed by the plain terms of the Agreement. Under Maryland law—which provides the applicable rules of contract interpretation in this case—where a contract is plain and unambiguous, its terms are controlling ...."). So long as Maryland—not federal or "federalized"—law governs the interpretation of interconnection agreements, neither the 1996 Act nor any other federal law creates a cause of action that would support jurisdiction under 28 U.S.C. § 1331.

■ Occasionally however, Verizon appears to suggest that interconnection agreements are to be interpreted under a federal common law of contract. If so, its misinterpretation claim would satisfy the "arising under" requirement of 28 U.S.C. § 1331. Yet merely because Congress requires telecommunications carriers to execute interconnection agreements, their interpretation does not become a matter of federal common law. *Jackson Transit Auth. v. Local Div. 1285, Amalgamated Transit Union,* 457 U.S. 15, 22, 29, 102 S.Ct. 2202, 72 L.Ed.2d 639 (1982).

■ Interconnection agreements may well be "creations of federal law." *Int'l Ass'n of Machinists v. Cent. Airlines, Inc.,* 372 U.S. 682, 692, 83 S.Ct. 956, 10 L.Ed.2d

67 (1963); *see also* Peter W. Huber et al., Federal Telecommunications Law 76 (2d ed. Supp.2002)(so arguing). Only, however, if Congress *also* intended "that the rights and duties contained in [such] contracts be federal in nature," do post-agreement disputes about the meaning of contractual terms raise federal questions. *Jackson Transit Auth.,* 457 U.S. at 23, 102 S.Ct. 2202. In other words, "absent evidence of congressional intent to make contractual rights and duties 'federal in nature,' even causes of action based on an alleged breach of a federally-mandated contract provision present 'only state-law claims.' " *Nieto–Santos v. Fletcher Farms,* 743 F.2d 638, 641 (9th Cir.1984)(quoting *Jackson Transit Auth.,* 457 U.S. at 23, 102 S.Ct. 2202).

■ The 1996 Act evinces no congressional intent that federal courts—much less state administrative agencies—craft a federal common law of contract interpretation to construe the provisions of interconnection agreements. This is not surprising. Congress has authorized the creation of a body of federal common law in but few instances. *See Tex. Indus., Inc. v. Radcliff Materials, Inc.,* 451 U.S. 630, 641, 101 S.Ct. 2061, 68 L.Ed.2d 500 (1981)("[A]bsent some congressional authorization to formulate substantive rules of decision, federal common law exists only in ... narrow areas ...."). Only when "there is a 'significant conflict between some federal policy or interest and the use of state law' " should a court fashion a federal rule of decision. *O'Melveny & Myers v. FDIC,* 512 U.S. 79, 87, 114 S.Ct. 2048, 129 L.Ed.2d 67 (1994)(quoting *Wallis v. Pan Am. Petroleum Corp.,* 384 U.S. 63, 68, 86 S.Ct. 1301, 16 L.Ed.2d 369 (1966)). Otherwise, "matters left unaddressed in ... a [comprehensive and detailed federal regulatory] scheme are presumably left subject to the disposition provided by state law."

*Id.* at 85, 114 S.Ct. 2048; *see also* Erwin Chemerinsky, Federal Jurisdiction § 6.1, at 350 (3d ed. 1999)("There has long been a strong presumption against the federal courts fashioning common law to decide cases. The Rules of Decision Act, which was part of the Judiciary Act of 1789 and which remains largely unchanged to this day, states that 'the laws of the several states, except where the Constitution or treaties of the United States or Acts of Congress otherwise require or provide, shall be regarded as rules of decision in civil actions in the courts of the United States, in cases where they apply.' [28 U.S.C. § 1652.] This law, by its very terms, seems to deny the existence of federal common law; the Rules of Decision Act commands that in the absence of positive federal law, federal courts must apply state law.").

▮ Verizon attempts to analogize interconnection agreements to federal interstate tariffs for long-distance telephone service. Verizon's Mot. for Summ. J. at 11; *see also* Huber, *supra*, at 76 (same). Such tariffs are "essentially offers to sell" long-distance telephone service "on specified terms, filed with the FCC and subject to modification or disapproval by it." *Cahnmann v. Sprint Corp.*, 133 F.3d 484, 487 (7th Cir.1998). When individuals contract for long-distance telephone service, they subscribe to any one of various filed tariffs. The tariffs, then, become the contracts between telecommunications carriers and their customers. They entitle subscribers in all fifty states to uniform rates and services. *See id.* at 487–88. And, to maintain that uniformity, federal courts have treated the tariffs themselves as equivalent to federal regulations. *Lowden v. Simonds–Shields–Lonsdale Grain Co.*, 306 U.S. 516, 520, 59 S.Ct. 612, 83 L.Ed. 953 (1939). Because all the terms of a tariff are *de jure* federal regulations, federal law defines the entire contractual relationship between the parties. *Cahnmann,*

133 F.3d at 489. "Federal law does not merely create a right; it occupies the whole field, displacing state law." *Id.* State contract law, then, cannot apply to the interpretation of a tariff, and a suit to enforce a tariff arises under federal law. *Thurston Motor Lines, Inc. v. Jordan K. Rand, Ltd.,* 460 U.S. 533, 535, 103 S.Ct. 1343, 75 L.Ed.2d 260 (1983)(per curiam); *Louisville & Nashville R.R. v. Rice,* 247 U.S. 201, 203, 38 S.Ct. 429, 62 L.Ed. 1071 (1918).

Tariffs and interconnection agreements, however, are altogether different beasts. Whatever need there might be for national uniformity in the tariffed terms of long-distance telephone service, no comparable need exists in the terms of interconnection between ILECs and CLECs. While it is true that the 1996 Act obliges an ILEC to make any existing interconnection agreement available on the same terms to other CLECs, *see* 47 U.S.C. § 252(i), the number of CLECs that might request such an agreement falls far below the number of long-distance telephone customers that might subscribe to a filed tariff: a handful (or two) of CLECs might so contract with an ILEC; thousands, even millions, of customers might contract for tariffed long-distance telephone service with a carrier.

Moreover, the parties to interconnection agreements are all *local* exchange carriers. *See id.* § 251(b)(confining the duties of interconnection to "local exchange carriers"); *id.* § 153(26)(defining "local exchange carrier," in relevant part, as "any person that is engaged in the provision of telephone exchange service or exchange access"); *id.* § 153(47)(defining "telephone exchange service" as "(A) service within a connected system of telephone exchanges within the same exchange area operated to furnish to subscribers intercommunicating service of the character ordinarily furnished by a single exchange, and which is

covered by the exchange service charge, or (B) comparable service provided through a system of switches, transmission equipment, or other facilities (or combination thereof) by which a subscriber can originate and terminate a telecommunications service"); *N.C. Utils. Comm'n v. FCC*, 552 F.2d 1036, 1045 (4th Cir.1977)(referring to "telephone exchange service" as a "statutory term of art," meaning "service within a *discrete* local exchange system")(emphasis added). Of course, some local exchange carriers, such as those operating in metropolitan areas that cross state boundaries, do provide interstate service. Nevertheless, they carry communications between a very small number of states, and they do so subject primarily to the authority of local, state regulatory agencies. *See* 47 U.S.C. § 221(b) ("[N]othing in this chapter shall be construed ... to give the [FCC] jurisdiction, with respect to charges, classifications, practices, services, facilities, or regulations for or in connection with ... telephone exchange service ... even though a portion of such exchange service constitutes interstate or foreign communication, in any case where such matters are subject to regulation by a State commission or by local governmental authority."). Subscribers to a single long-distance telephone tariff, on the other hand, are not likely all "local." They may live anywhere in the United States, and their long-distance communications may begin in Baltimore and terminate in Ulan Bator.

■ Most significantly, Congress made it abundantly clear that federal law does *not* define the entire contractual relationship between parties to interconnection agreements. Local exchange carriers may enter into agreements "without regard" to the Act's requirements. 47 U.S.C. § 252(a)(1). States themselves may im-

pose state law requirements in interconnection agreements, so long as such requirements do not conflict with federal law. *See id.* §§ 251(d)(3), 252(e)(3), 261(c). The savings clause of the 1996 Act likewise provides that "[t]his Act ... shall not be construed to modify, impair, or supersede Federal, State, or local law unless expressly so provided in such Act or amendments." Pub.L. No. 104–104, § 601(c)(1), 110 Stat. 143 (1996)(reprinted in 47 U.S.C. § 152, historical and statutory notes).[5] Odd it would be—in the absence of congressional command—if terms imposed by a state commission under state law were to be construed in accordance with federal common law. Federal common law, then, does not govern the interpretation of interconnection agreements.

■ Finally, Verizon also occasionally seems to invoke the speculative (and spectral) theory of "protective jurisdiction" to embrace its misinterpretation claim. This theory posits that "Congress may authorize federal court jurisdiction where it believes that federal court availability is necessary to protect important federal interests"—even in cases substantively governed by state law. Chemerinsky, *supra*, § 5.2.2, at 271. The statute conferring jurisdiction itself serves as the "law of the United States" under which the state-law claim "arises." *Id.* at 273.

If it is supposed that 28 U.S.C. § 1331 grants jurisdiction over Verizon's misinterpretation claim, however, the theory of protective jurisdiction is inapt. Scholars, commentators, and the occasional Supreme Court justice have only applied the theory of protective jurisdiction within the context of a special jurisdictional statute, never within the context of the general federal-question jurisdictional statute. *See, e.g.,*

---

**5.** Although not codified in § 152 itself, the savings clause was enacted into law and is binding authority.

*Textile Workers Union of Am. v. Lincoln Mills of Ala.,* 353 U.S. 448, 460, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957)(Burton & Harlan, JJ., concurring in the result)(contending that state law should be applied in contract cases brought to federal court under § 301 of the Labor–Management Relations Act, 29 U.S.C. § 185).

The theory becomes relevant only if it is supposed that § 252(e)(6) confers a special jurisdiction on the federal courts. The Supreme Court, however, has never endorsed the theory of protective jurisdiction. Indeed, it has cast grave doubt on its validity. *See Mesa v. California,* 489 U.S. 121, 136, 109 S.Ct. 959, 103 L.Ed.2d 99 (1989) (calling attention to "the distinction between 'jurisdictional statutes' and 'the federal law under which [an] action arises, for Art. III purposes,' " and stating that "pure jurisdictional statutes which seek 'to do nothing more than grant jurisdiction over a particular class of cases' cannot support Art. III 'arising under' jurisdiction") (quoting *Verlinden B.V. v. Cent. Bank of Nigeria,* 461 U.S. 480, 496, 103 S.Ct. 1962, 76 L.Ed.2d 81 (1983)). If a case arises under federal law whenever a federal statute gives jurisdiction, federal jurisdiction would expand limitlessly. *See* Chemerinsky, supra, § 5.2.2, at 273; *Textile Workers Union of Am.,* 353. U.S. at 475, 77 S.Ct. 912 (Frankfurter, J., dissenting)(" 'Protective jurisdiction' cannot generate an independent source for adjudication outside of the Article III sanctions and what Congress has defined. The theory must have as its sole justification a belief in the inadequacy of state tribunals in determining state law. The Constitution reflects such a belief in the specific situation within which the Diversity Clause was confined. The intention to remedy such supposed defects was exhausted in this provision of Article III.").

Even if § 252(e)(6) both creates a cause of action and confers jurisdiction on the federal courts, the jurisdiction conferred does not extend to a state-law claim of contract misinterpretation. *Cf. Verlinden B.V.,* 461 U.S. at 496, 103 S.Ct. 1962 (finding that the Foreign Sovereign Immunities Act of 1976, 28 U.S.C. § 1330, is a "comprehensive scheme" that includes both a jurisdictional grant and substantive federal law capable of supporting Article III "arising under" jurisdiction). It extends only so far as the federal cause of action, which extends no further than review of a state commission's decision for compliance with *federal* law. *See supra.*

The 1996 Act establishes a regime of cooperative federalism, in which state commissions can exercise their expertise about the local telecommunications market, but are guided by the provisions of the 1996 Act and its FCC glosses, and checked by federal court review for consistency with the federal provisions. *P.R. Tel. Co. v. Telecomms. Regulatory Bd.,* 189 F.3d 1, 14 (1st Cir.1999). It would be "surpassing strange to preserve state authority in this fashion and then to put federal courts in the position of overruling a state agency on a pure issue of state law." *Id.* at 15 (citation and internal quotation marks omitted).

### 2. Federal Element in State–Law Cause of Action?

It thus appears that federal law creates no cause of action for Verizon's claim that the PSC misinterpreted the terms of the WorldCom agreement. Federal-question jurisdiction under 28 U.S.C. § 1331 may nevertheless exist if "some substantial, disputed question of federal law is a necessary element" of the claim. *Franchise Tax Bd.,* 463 U.S. at 13, 103 S.Ct. 2841. Still, "the mere presence of a federal issue in a state cause of action does not automatically confer federal-question jurisdiction." *Merrell Dow Pharms. Inc.*

*v. Thompson,* 478 U.S. 804, 813, 106 S.Ct. 3229, 92 L.Ed.2d 650 (1986); *see also Textile Workers Union of Am.,* 353 U.S. at 470, 77 S.Ct. 912 (Frankfurter, J., dissenting)(focusing the inquiry on "the degree to which federal law must be in the forefront of the case and not collateral, peripheral or remote"). In an "area of uncertain jurisdiction," a court must make "careful judgments about the exercise of federal judicial power." *Merrell Dow Pharms. Inc.,* 478 U.S. at 814, 106 S.Ct. 3229.

Verizon points out that "many so-called 'negotiated' provisions [of interconnection agreements] represent nothing more than an attempt to comply with the requirements of the 1996 Act." *AT & T Communications of S. States, Inc. v. Bellsouth Telecomms., Inc.,* 229 F.3d 457, 465 (4th Cir.2000). Carriers, in other words, often voluntarily agree to "track" federal law— their contractual obligations changing as prevailing federal law evolves. Thus, as Verizon argues, if (1) the WorldCom agreement tracks the controlling federal law (including FCC rulings and interpretations), *and* if (2) the controlling federal law does not require reciprocal compensation for calls to ISPs, then the agreement cannot require such compensation.

The logic of this syllogism is impeccable. Only, however, if *both* protases are proved true does the apodosis hold true. And— unless the 1996 Act either has created a federal common law of contract interpretation or has protectively "federalized" state law of contract interpretation, *see supra* part A.1.b—determination of the truth or falsity of the *first* protasis does not involve a federal question: "It is a question of State law ... whether [an] interconnection agreement ... includes a dynamic incorporation of statutory interpretation, including the definition of which calls constitute ... calls subject to reciprocal compensation." *Bell Atl.-Md., Inc.,* 240 F.3d at 297. Any

question of federal law is remote and contingent:

> The most one can say is that a question of federal law is lurking in the background, just as farther in the background there lurks a question of constitutional law, the question of state power in our federal form of government. A dispute so doubtful and conjectural, so far removed from plain necessity, is unavailing to extinguish the jurisdiction of the states.

*Gully v. First Nat'l Bank in Meridian,* 299 U.S. 109, 117, 57 S.Ct. 96, 81 L.Ed. 70 (1936)(Cardozo, J.). Thus, 28 U.S.C. § 1331, at least, does not confer jurisdiction on this Court to review a state commission's determination that a given agreement tracks or does not track federal law.

Section 1331 might support jurisdiction when: (1) a state commission has determined (under the local law of contract interpretation) that an interconnection agreement *does* "track" prevailing federal law *and* that prevailing federal law imposes a certain requirement; and (2) the complaining party claims that federal law does not impose that requirement. Such, however, is not the case here. The PSC found no indication in the WorldCom agreement that the parties had intended to incorporate evolving standards of federal law into their agreement. It found instead that Verizon had intended to treat ISP-bound calls as "local traffic" and, therefore, under the terms of the agreement, subject to reciprocal compensation. *Second WorldCom Order* at 10–14.

### 3. Supplemental Jurisdiction

■ The supplemental jurisdiction statute provides that "in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action

within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a). In this case, the Court has original jurisdiction over the claim that federal law preempts the PSC's *Second WorldCom Order. See supra,* part A.1.a.

Maryland law grants any "party or person in interest ... that is dissatisfied by a final decision or order of the [PSC]" the right to "seek judicial review of the decision or order as provided" by statute. Md. Code Ann., Pub. Util. Cos. § 3–202 (1998). This right of action clearly embraces Verizon's claim that the PSC erred in its application of Maryland law to the construction of the WorldCom agreement—a claim intimately related to Verizon's federal preemption claims. Moreover, even though the state-law claim is appellate in nature, this Court may, at its discretion and if appropriate, assume jurisdiction over it. *See City of Chicago v. Int'l Coll. of Surgeons,* 522 U.S. 156, 166–72, 118 S.Ct. 523, 139 L.Ed.2d 525 (1997)(holding that a district court may exercise supplemental jurisdiction over a claim seeking review of a local administrative decision under a state's administrative procedure statute when the court has original jurisdiction over another claim).

### B. *Federal Preemption Claims*

 The Court reviews the PSC's conclusions of federal law *de novo.* *GTE South, Inc. v. Morrison,* 199 F.3d 733, 745 (4th Cir.1999). The 1996 Act, however, does not transform the Court into "a super public utilities commission." *Id.* Therefore, the "substantial evidence" or "arbitrary and capricious" standard governs review of the PSC's findings of fact or determinations of policy. *Id.* 745 n. 5.

### 1. *Count I: The Negotiated Agreements with WorldCom et al.*

The now-vacated *ISP Order* categorized ISP-bound calls as nonlocal—"jurisdictionally mixed and ... largely interstate." *ISP Order,* 14 F.C.C.R. at 3690, 1999 WL 98037 (¶ 1). Although § 251(b)(5) of the 1996 Act purports to extend the duty of reciprocal compensation to all "telecommunications," the FCC's implementing regulations then in effect interpreted the requirement as limited to "local telecommunications traffic." 47 C.F.R. § 51.701(a)(1998)("The provisions of this subpart apply to reciprocal compensation for transport and termination of local telecommunications traffic between LECs and other telecommunications carriers"); *see also Bell Atl. Tel. Cos.,* 206 F.3d at 4. Therefore, the FCC concluded that the 1996 Act does not require reciprocal compensation for calls to ISPs. *ISP Order,* 14 F.C.C.R. at 3693–3702 (¶¶ 7, 10–19), 1999 WL 98037.

Nevertheless, the FCC emphasized that this conclusion "does not in itself determine whether reciprocal compensation is due in any particular instance." *Id.* at 3690 (¶ 1), 1999 WL 98037. It advised that "[i]n the absence, to date, of a federal rule regarding the appropriate inter-carrier compensation for [ISP-bound] traffic ... parties should be bound by their existing interconnection agreements, as interpreted by state commissions." *Id.* Pointing out that it had previously treated ISP-bound traffic as local, *id.* at 3703 (¶ 23), 1999 WL 98037, the FCC emphasized that ILECS and CLECS "entering into interconnection agreements may reasonably have agreed, for the purposes of determining whether reciprocal compensation should apply to ISP-bound traffic, that such traffic should be treated in the same manner as local traffic." *Id.* at 3703–04 (¶ 24), 1999 WL 98037.

The FCC then suggested several factors that "may be appropriate for state commissions to consider" when determining whether parties to interconnection agreements had agreed to pay reciprocal compensation for ISP-bound calls. *Id.* at 3704 (¶ 24), 1999 WL 98037. Yet it recognized that "state commissions, not [the FCC], are the arbiters of what factors are relevant in ascertaining the parties' intentions." *Id.* The FCC concluded: "Nothing in this Declaratory Ruling, therefore, necessarily should be construed to question any determination a state commission has made, or may make in the future, that parties have agreed to treat ISP-bound traffic as local traffic under existing interconnection agreements." *Id.; see also id.* at 3703 (¶ 21), 1999 WL 98037("We find no reason to interfere with state commission findings as to whether reciprocal compensation provisions of interconnection agreements apply to ISP-bound traffic.").

After the D.C. Circuit vacated and remanded the *ISP Order,* the FCC reaffirmed, in a separate proceeding, that state commissions should continue to determine whether parties contracted to pay reciprocal compensation for calls to ISPs in their interconnection agreements. *In re Starpower Communications, LLC,* 15 F.C.C.R. 11,277, 11,281 (¶ 9), 2000 WL 767701 (2000).

Subsequently, reconsidering its *ISP Order* decision on remand, the FCC issued the now-remanded-but-not-vacated *ISP Remand Order.* The FCC expressly abandoned its past focus on the local or nonlocal nature of calls in determining whether the 1996 Act mandates reciprocal compensation. *ISP Remand Order,* 16 F.C.C.R. at 9173 (¶ 46), 2001 WL 455869. Instead, it determined that § 251(g) of the 1996 Act excludes certain types of telephone traffic, including "information access" services, from the realm of "telecommunications" in § 251(b)(5). *Id.* at 9166–67 (¶¶ 34–36), 2001 WL 455869, Finding that "information access" services include ISP-bound traffic, the FCC concluded (again) that the 1996 Act does not require reciprocal compensation for calls to ISPs. *Id.* at 9170–71 (¶ 42), 2001 WL 455869. The FCC nevertheless acknowledged that carriers incur costs when they deliver traffic to ISPs, and it therefore established interim, prospective rules to provide compensation.[6] *Id.* at 9156–57 (¶ 8), 9186–93 (¶¶ 77–88, 2001 WL 455869).

More germane to the instant action, the FCC iterated and reiterated that the intercarrier compensation rules apply prospectively only, and that existing interconnection agreements and previous state commission decisions remain undisturbed.[7] *Id.* at 9189 (¶ 82)("The interim compensation regime we establish here applies as carriers renegotiate expired or expiring interconnection agreements. It does not alter existing contractual obligations, except to the extent that parties are entitled to invoke contractual change-of-law provisions. This Order does not preempt any state commission decision regarding compensation for ISP-bound traffic for the period prior to the effective date of the interim regime we adopt here."); *see also id.* at 9186 (¶ 77), 2001 WL 455869("Subsequent to [the *ISP Order*], many states

---

**6.** The D.C. Circuit, in remanding the *ISP Remand Order,* squarely rejected the FCC's determination that § 251(g) "carves out" ISP-bound traffic from the 1996 Act's reciprocal compensation obligations. 288 F.3d at 430; *see also id.* at 432 (holding that " § 251(g) is not susceptible to the [FCC]'s reading"). Nevertheless, finding a "non-trivial likeli-hood" that another, valid legal basis might support the FCC's action, it left standing the prospective compensation rules. *Id.* at 434.

**7.** The new rules took effect June 14, 2001. *See* 66 Fed.Reg. 26,800 (May 15, 2001)(now codified at 47 C.F.R. pt. 51).

have required the payment of reciprocal compensation for ISP-bound traffic, and CLECs may have entered into contracts with vendors or with their ISP customers that reflect the expectation that the CLECs would continue to receive reciprocal compensation revenue. We believe it appropriate, in tailoring an interim compensation mechanism, to take those expectations into account . . . .").

Before the D.C. Circuit remanded the *ISP Remand Order*, the FCC issued at least three other decisions confirming the primacy of carriers' contractual obligations. *See Global NAPS, Inc. v. Verizon Communications*, 17 F.C.C.R. 4031, 2002 WL 287521 (2002); *Starpower Communications, LLC v. Verizon South Inc.*, 17 F.C.C.R. 6873 (2002) [hereinafter *Starpower II* ]; *Cox Va. Telcom, Inc. v. Verizon South Inc.*, 17 F.C.C.R. 8540, 2002 WL 959360 (2002). In the first case, the FCC reminded the parties that, under its *ISP Remand Order*, "pre-existing contractual obligations [in interconnection agreements] remain in effect." *Global NAPs, Inc.*, 17 F.C.C.R. at 4038 (¶ 17), 2002 WL 287521.

In the latter two cases, the FCC interpreted specific interconnection agreements to ascertain whether carriers had agreed to pay reciprocal compensation for calls to ISPs under pre-existing interconnection agreements.[8] In both cases, Verizon South argued—as Verizon does here—that it would be inconsistent with federal law to require it to pay reciprocal compensation under its agreements with its competitors. *Starpower II*, 17 F.C.C.R. at 6893–94 (¶¶ 46–48), 2002 WL 518062; *Cox Va. Telcom, Inc.*, 17 F.C.C.R. at 8549–50 (¶¶ 24–26), 2002 WL 959360. The FCC disagreed. It found Verizon South's argument "meritless" because Verizon South had voluntarily agreed, in the interconnection

agreements at issue, to pay reciprocal compensation. *Starpower II*, 17 F.C.C.R. at 6893 (¶ 46); *Cox Va. Telcom, Inc.*, 17 F.C.C.R. at 8549 (¶ 24), 2002 WL 959360. And, as the FCC had observed, it had "twice . . . held . . . that during the period relevant here, carriers could address in their interconnection agreements the issue of compensation for the delivery of ISP-bound traffic." *Starpower II*, 17 F.C.C.R. at 6882 (¶ 23)(referring to the *ISP Order* and the *ISP Remand Order* ); *Cox Va. Telcom, Inc.*, 17 F.C.C.R. at 8547 (¶ 19), 2002 WL 959360(same). As federal law posed no impediment, the determination whether reciprocal compensation was due turned solely on contract interpretation. *Starpower II*, 17 F.C.C.R. at 6882 (¶ 23); *Cox Va. Telcom, Inc.*, 17 F.C.C.R. at 8547 (¶ 19), 8550 (¶ 27) n. 85, 2002 WL 959360.

In sum, every relevant FCC ruling, order, decision, and regulation has permitted ILECs and CLECs, when entering into interconnection agreements during the period that Verizon and the defendant CLECs entered into the agreements at issue here, to agree to pay reciprocal compensation for ISP-bound traffic—regardless whether the FCC categorized such traffic as local, nonlocal, or "information access" service.

As the Fourth Circuit commented in its opinion in this case—albeit vacated, but on other grounds: "The 1996 Act [itself] also furnishes little basis for concluding that an interconnection agreement providing for the payment of reciprocal compensation for the termination of ISP-bound calls is inconsistent with the requirements of federal law." *Bell Atl.-Md., Inc.*, 240 F.3d at 296. It remains hard to understand how such an agreement contravenes the bald mandate that carriers establish recip-

---

**8.** The FCC adjudicated the disputes because the relevant state commission had opted not to do so. *See* 47 U.S.C. § 252(e)(5).

rocal compensation arrangements. 47 U.S.C. § 251(b)(5). The 1996 Act, moreover, explicitly condones (even favors) the negotiation and formation of voluntary interconnection agreements to fulfill the duties imposed by § 251(b) and (c), but "without regard to the standards set forth in" those provisions. *Id.* § 252(a)(1).

■ In fine, even if the 1996 Act and its FCC interpretations do not *require* reciprocal compensation for ISP-bound calls, they do not *prohibit* carriers from having agreed (at least during the period relevant here) to pay reciprocal compensation for such calls. *See Ill. Bell Tel. Co.,* 179 F.3d at 573 ("That the Act does not *require* reciprocal compensation for calls to ISPs is not to say that it *prohibits* it. The Act simply sets out the obligations of all local exchange carriers to provide for reciprocal compensation."). The PSC, applying the Maryland law of contract interpretation, found that Verizon had so agreed. Federal law, then, does not preclude the PSC from ordering Verizon to adhere to its contractual obligations. Accordingly, the defendants are entitled to summary judgment on Verizon's claim that the *Second WorldCom Order* violates the 1996 Act or the FCC's interpretations of the Act simply because it requires payment of reciprocal compensation for ISP-bound calls. Verizon's corresponding motion for summary judgment must be denied.

### 2. *Count II: The SGAT Agreement with Global*

■ In the now-vacated *ISP Order,* the FCC ruled that "[e]ven where parties to interconnection agreements do not voluntarily agree on an inter-carrier compensation mechanism for ISP-bound traffic, state commissions may nonetheless determine in their arbitration proceedings at this point that reciprocal compensation should be paid for this traffic." *ISP Order,* 14 F.C.C.R. at 3704–05 (¶ 25), 1999

WL 98037. Concluding, the FCC again emphasized: "[N]othing in this Declaratory Ruling precludes state commissions from determining, pursuant to ... legal or equitable considerations, that reciprocal compensation is an appropriate interim inter-carrier compensation rule pending completion of [FCC] rulemaking." *Id.* at 3706 (¶ 27), 1999 WL 98037.

The now-remanded-but-not-vacated *ISP Remand Order* stripped state commissions of their authority to impose on carriers any obligation to pay reciprocal compensation for ISP-bound calls *after* June 14, 2001. *ISP Remand Order,* 17 F.C.C.R. at 9189 (¶ 82), 2002 WL 992213; *see also supra,* note 7. Impositions made before that date, however, it validated. *ISP Remand Order,* 17 F.C.C.R. at 9189 (¶ 82), 2002 WL 992213("This Order does not preempt any state commission decision regarding compensation for ISP-bound traffic for the period prior to the effective date of the interim regime we adopt here."). And the PSC approved the Global–Verizon SGAT-based agreement—with its state-imposed reciprocal compensation obligations—on or around May 9, 2001.

The 1996 Act, moreover, preserves the authority of state commissions to "establish[ ] access and interconnection obligations of local exchange carriers" which are "consistent with the requirements of [§ 251]," and which "do[ ] not substantially prevent implementation of the requirements of [§ 251] and the purposes of" the Act. 47 U.S.C. § 251(d)(3); *see also id.* §§ 252(e)(3), 261(b)-(c). It also specifically permits state commissions to establish and enforce requirements of state law when reviewing or approving SGATs—provided, again, that the requirements do not offend federal law. *Id.* § 252(f)(2).

In its *Second WorldCom Order,* the PSC recognized, correctly, that the now-vacated *ISP Order* left it free not to require reciprocal compensation for ISP-bound calls.

*Second WorldCom Order* at 16. It nevertheless decided to impose such a requirement on carriers adopting Verizon's SGAT because it believed the requirement would best advance local public policy:

> No one disputes that local exchange carriers incur costs to terminate the traffic of other carriers over their network. In the absence of finding that reciprocal compensation applies, a class of calls (ISP traffic) will exist for which there is no compensation. The reciprocal compensation rates established by our arbitration order and contained in the approved [SGAT] reflect the costs of this termination. Until the FCC establishes an appropriate inter-carrier compensation mechanism for ISP-bound traffic, we find that it is in the public interest to require [Verizon] to pay our arbitrated reciprocal compensation rates contained in the SGAT as an interim compensation mechanism.

*Id.* at 17. Even if the PSC misjudged the public interest, it did not contravene the law.

Because the PSC's decision conflicts neither with the 1996 Act nor with its FCC interpretations, the defendants are entitled to summary judgment on Verizon's claim that the *Second WorldCom Order* violates federal law by requiring payment of reciprocal compensation for ISP-bound calls in arbitrated or SGAT-based agreements approved during the period relevant here. Indeed, fundamentally, this claim differs little from Verizon's other preemption claim. So too, Verizon's corresponding motion for summary judgment must be denied.

## C. *State–Law Claim*

█ In exercising its supplemental jurisdiction over Verizon's contract-misinterpretation claim, this Court would assume the posture of a Maryland circuit court, which would ordinarily entertain a suit challenging an order of the PSC. Md.Code Ann., Pub. Util. Cos. § 3–204(a)(1998). Review would be limited accordingly. *See id.* § 3–203 (Supp.2002)("Every final decision, order, or regulation of the [PSC] is prima facie correct and shall be affirmed unless clearly shown to be: (1) unconstitutional; (2) outside the statutory authority or jurisdiction of the [PSC]; (3) made on unlawful procedure; (4) arbitrary or capricious; (5) affected by other error of law; or (6) if the subject of review is an order entered in a contested proceeding after a hearing, unsupported by substantial evidence on the record considered as a whole."); *Bell Atl. of Md., Inc. v. Intercom Sys. Corp.*, 366 Md. 1, 20–22, 782 A.2d 791 (2001)(ascribing the restricted scope of review to the constitutionally grounded doctrine of separation of powers).

Supplemental jurisdiction, however, may be declined. 28 U.S.C. § 1367(c); *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966)("It has been consistently recognized that pendent jurisdiction is a doctrine of discretion, not of plaintiff's right."). And "needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law." *Gibbs*, 383 U.S. at 726, 86 S.Ct. 1130. Typically, courts decline to exercise supplemental jurisdiction when all the federal claims have been disposed of prior to a full trial on the merits. *See J.H. by David H. v. ABC Care, Inc.*, 953 F.Supp. 675, 684 (D.Md.1996).

█ A court may even be obligated not to decide a state-law claim when the principles of abstention dictate. *Int'l Coll. of Surgeons*, 522 U.S. at 174, 118 S.Ct. 523. Indeed, review of state administrative action for compliance with state law may so trench upon a state's sovereign prerogative as to warrant abstention. *See id.* (cautioning that "there may be situations

in which a district court should abstain from reviewing local administrative determinations even if the jurisdictional prerequisites are otherwise satisfied").

 In the instant matter, this Court may not even have the jurisdiction to decline—at least as against the commissioners of the PSC. The commissioners have asserted their sovereign immunity from suit. And although the Supreme Court has held expressly that this Court has jurisdiction over Verizon's *federal* claims against the commissioners in their official capacities pursuant to the doctrine of *Ex Parte Young, see Verizon Md. Inc.*, 122 S.Ct. at 1760–61, that doctrine does not apply to state-law claims. *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 106, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984)("[I]t is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law.... We conclude that [the doctrine of *Ex Parte* ] *Young* . . . [is] inapplicable in a suit against state officials on the basis of

state law."). Sovereign immunity may thus bar Verizon's contract-misinterpretation claim against the commissioners of the PSC. *Id.; see also Bragg v. W. Va. Coal Ass'n,* 248 F.3d 275, 293 (4th Cir.2001).

 Accordingly, to whatever extent supplemental jurisdiction exists, this Court declines to exercise it. Verizon's claim that the PSC misconstrued its agreement with WorldCom will be dismissed without prejudice.[9]

## CONCLUSION

For the foregoing reasons, a separate order will be issued: GRANTING the defendants' motions for summary judgment as to Count I of the amended complaint, with respect to the federal preemption claim; GRANTING the defendants' motions for summary judgment as to Count II of the amended complaint; DENYING Verizon's motion for summary judgment as to Count I of the amended complaint, with respect to the federal preemption claim; DENYING Verizon's motion for summary judgment as to Count II of the amended

---

9. The Court notes that the Maryland statute of limitations will not bar Verizon's state-law claim if suit is filed in the appropriate state court within thirty days of this dismissal. Maryland Rule 2–101(b)(2003). As the defendants cogently argue, however, the Court also notes that principles of *res judicata* may well bar such a claim. In its *First WorldCom Order,* the PSC concluded, "based on the terms of the [WorldCom agreement]," that WorldCom was entitled to compensation for the termination of ISP-bound calls. *First WorldCom Order* at 2. Verizon sought review of the PSC's determination before a Maryland state court, which affirmed the PSC's order. Verizon never appealed the state court's decision. Under Maryland law, "[o]nce the statutory mode of appeal has been exhausted, no further right remains in a party to secure review of a final decision of an agency." *Lawrence N. Brandt, Inc. v. Montgomery County Comm'n on Landlord–Tenant Affairs,* 39 Md.App. 147, 155, 383 A.2d 688 (1978). The power of an administrative agency to

rehear and reconsider "must be exercised within a reasonable time, and before an appeal from its original order has been lodged in the courts." *Id.* at 160, 383 A.2d 688 (quoting 73 C.J.S. Admin. Bodies & Procedure § 156 (1951))(internal quotation marks and emphasis omitted). The action of an agency in reopening a matter beyond its power is void. *Calvert County Planning Comm'n v. Howlin Realty Mgmt., Inc.,* 364 Md. 301, 323–25, 772 A.2d 1209 (2001). Thus, insofar as Verizon requested that the PSC reconsider the parties' intent under the WorldCom agreement, and insofar as the PSC reconsidered their intent in its *Second WorldCom Order,* the state court's affirmation of the *First World-Com Order* constrained the PSC's action. So too, it seems, the state court's affirmation precludes relitigation of what the parties intended. But as is true with the substantive issue discussed in the text above, this procedural issue is best determined by a Maryland court, not this one.

complaint; DISMISSING Count I of the amended complaint, with respect to the contract-misinterpretation claim; and MOOTING all motions for summary judgment as to Count I of the amended complaint, with respect to the contract-misinterpretation claim.

## ORDER AND JUDGMENT

For the reasons set forth in the Memorandum Opinion of even date, it is, this 5th day of March 2003, hereby ORDERED and ADJUDGED:

1. That the defendants' motions for summary judgment BE, and they hereby ARE, GRANTED IN PART as to Count I of the amended complaint, with respect to the federal preemption claim;

2. That the plaintiff's motion for summary judgment BE, and it hereby IS, DENIED IN PART as to Count I of the amended complaint, with respect to the federal preemption claim;

3. That JUDGMENT BE, and it hereby IS, ENTERED as to Count I of the amended complaint, with respect to the federal preemption claim, in favor of the defendants and against the plaintiff;

4. That the defendants' motions for summary judgment BE, and they hereby ARE, GRANTED as to Count II of the amended complaint;

5. That the plaintiff's motion summary judgment BE, and it hereby IS, DENIED as to Count II of the amended complaint;

6. That JUDGMENT BE, and it hereby IS, ENTERED as to Count II of the amended complaint in favor of the defendants and against the plaintiff;

7. That Count I of the amended complaint BE, and it hereby IS, DISMISSED IN PART without prejudice, with respect to the contract-misinterpretation claim, pursuant to 28 U.S.C. § 1367(c)(3);

8. That the motions of the plaintiff and the defendants for summary judgment as to Count I of the amended complaint, with respect to the contract-misinterpretation claim, BE, and it hereby IS, MOOTED; and

9. That the Clerk of the Court send copies of this Order and the Memorandum Opinion to counsel for the parties.